Stancell, ex'r. *vs.* Kenan *et al.*

---

GEORGE W. STANCELL, executor, etc., plaintiff in error, vs.
MICHAEL J. KENAN, *et. al.*, defendant in error.

1. Testamentary capacity defined. The charge of the Court in this case
is not erroneous.
2. If counsel, from notes taken by him on a former trial, or from his
recollection of the charge of the Court as then given, or from notes of
the charge, taken by the presiding Judge, himself, rehearse such
charge, to the jury, and assume that it embodies the law of the case,
there is no good reason for arresting him, and prohibiting that course,
and a failure of the Court to arrest the counsel, is no sufficient
ground for a new trial.
3. This Court will not review anything which transpires *privately* in the
Court-room, between the Court and counsel.
4. It is not error in the Court to permit a special jury, engaged in a pro-
tracted trial of a civil cause, to separate whenever the Court takes a

recess for necessary refreshment, no motion being made *contra*, or cause shown for not allowing the separation.

5. The verdict in this case being strongly and decidedly against the weight of the evidence, and therefore contrary to law, must be set aside.

*Devisavit vel non*, in Whitfield Superior Court, tried before Judge D. A. WALKER, at the April Term, 1861.

On the 10th day of January, 1860, in the presence of Charles J. McDonald, Marble J. Camden, John Barrett, and Martin H. Dooly, as attesting witnesses, Owen H. Kenan made, ordained, and published, as his last will and testament, a paper containing the items following, that is to say:

" ITEM 1st—I wish all debts, if any, which I may owe at the time of my death, paid as speedily as possible."

" ITEM 2nd—I give and bequeath the son Michael, of my nephew, Michael J. Kenan, of McIntosh county, a negro boy child, named Mike, about eighteen months old, to him and his heirs forever."

" ITEM 3d—I give and bequeath the following named negroes to my neices, Arabella Horne, Ann Beecher, Uriah Gordon, in the manner hereinafter stated, viz : Robert, a man of yellow complexion, about thirty-five years old; Betsy, his wife, about thirty years old; Jinney, a girl about fourteen years old; Anthony, a boy, a copper color, about twenty years old; Banks, a boy about twelve years old; Lewis, a boy about four years old; the two last, of yellow complexion; Brown, a man of yellow complexion, about forty years old, and his wife, Phebe, half Indian, and Brown the son of Brown and Phebe; the said negroes, I give and bequeath to my neices aforesaid, and direct, that out of the proceeds of their labor, they are to be fed and clothed liberally, and as they have been faithful servants to me, they are to be kindly and humanely treated, and not to be worked cruelly or oppressively, and they are to be kept together in families, unless some one of them should steal, or be guilty of some other bad conduct, then such as misbehave in that way, are to be sold.  On the death of either of my said neices, the two survivors are to have and to hold said property, on the same

terms and conditions, and subject to the same directions as are above expressed, and on the death of one of the said two survivors aforesaid, the said negroes are to go to the survivor in the same way and under like instructions, and on the death of the last of my said neices, the said negroes and their natural increase are to go to, and vest in, Henrietta Kenan, Martha Owen Kenan, and Ella Kenan, the daughters of my nephew, Augustus H. Kenan, of Milledgeville, under the same charges and injunctions of kind treatment that I have imposed upon my neices aforesaid."

"ITEM 4th—I give and bequeath to my friend George Stancell, of Whitfield county, my law, and miscellaneous library, and a good horse, saddle and bridle."

"ITEM 5th—The money which I leave on hand, or in bank, or at interest, at the time of my death, I direct to be kept at interest, and at Christmas of each year, I wish a present made of five, ten, fifteen, or twenty dollars, to each of my faithful servants aforesaid, as named above, according to their age and faithful conduct, and the balance of the yearly interest to be divided between my neices as long as all of them shall live, then to the two survivors of them, and then to the last one surviving, and after her death, the balance of said interest, after paying the said presents to said negroes, to be divided equally each year, amongst the aforesaid daughters of my nephew Augustus H. Kenan."

"ITEM 6th—All such of my wearing apparel, bedding, and bed-clothing, as my said neices may not desire to have, is to be given out and divided amongst my said faithful servants, who are named in the third item of this, my will, but such part thereof as my said neices or either of them may desire, I give and bequeath to them."

"ITEM 7th—All the balance of my property, consisting of land, negroes, household and kitchen furniture, crops, grain, stock, and all and every thing, and articles of value, I give, bequeath and devise, to my said three neices, during their natural lives, to be divided equally between them, and if either should depart this life without leaving a child, or children, her share to go to the survivors, and if two should

die without leaving a child or children, then the survivor to
have the whole during her natural life, but should either of
my said neices depart this life, leaving a child or children,
leaving one or both of her sisters surviving her, then her
share shall be held for the benefit of her child or children,
until my last surviving neice shall depart this life, at which
time, the whole of said property and the natural increase of
the slaves, are to be equally divided amongst the children of
my said several neices, and Martha Owen Stark, daughter of
the late Honorable James H. Stark, deceased, of Spalding
county, and the three daughters of my nephew, Augustus H.
Kenan, hereinbefore named ; each of the three last named
legatees, daughters of my said nephew to have a share *pro-
vided* they marry, and at the time or shortly after she mar-
ries, and upon no other condition ; and if one or more of
them should not be married at the time of said last named
division, its or their share shall be withheld until she or
they shall marry, and if one or more of them should never
marry, their share or shares so reserved shall be equally di-
vided amongst the other legatees named in this clause of this
my will."

William Norton and George Stancell were appointed exe-
cutors of the will.

At the February Term, 1860, of the Court of Ordinary of
Whitfield county, the will was proved, in common form, by
the attesting witnesses, the testator having previously died
without revoking or changing it.

To this will, Michael J. Kenan, Uriah T. Kenan, William
McClure, and his wife, Bell McClure, and Edwin H. Har-
ris, and his wife, Lafayette Harris, next of kin of the testa-
tor, entered their caveat and objections on the following
grounds : 

" 1st. Because the said Owen H. Kenan, at the time of
making said pretended will, was not of sound and disposing
mind and memory."

" 2d. Because he was not, at the time of making and exe-
cuting said will, possessed of sufficient mental capacity to
make a will."

"3d. Because the said Owen H. Kenan, at the time of making and executing said pretended will, was of advanced age, and exceedingly imbecile and weak, and that said will is uncertain, unequal, unjust, and unnatural."

Upon these grounds the caveators demanded that the executors should be required to prove the will in solemn form, and that the same should be set aside and declared void, and of none effect.

The issue was tried before the Court of Ordinary, at April Term, 1860, and by the judgment of the Ordinary, the will was set up, and sustained, as the last will and testament of the testator.

From this judgment of the Ordinary the caveators entered an appeal to the Superior Court of said county of Whitfield.

Upon the trial of the case in the Superior Court, the Hon. Charles J. McDonald, the draftsman of, and one of the witnesses to the will testified, that in his opinion, the testator had sufficient mind and memory to make a will, that he came to the residence of witness in Marietta, and told him that he wanted him to write his will, that he attempted to imform witness how he desired the will written, but could not call the names of his legatees, or connect sentences together so as to be fully understood, that when he discovered that witness did not understand him, he expressed great pain at it, that he then said he wanted certain negroes given to three women, holding up his fingers and saying, "women, not men," and that he wanted these negroes protected, that in reply to inquiries, the testator said, he did not want them freed, or sent to a free State, or to Africa, for that that would be worse for them, that referring to the papers which he had sent to witness the evening before the will was written, the testator handed witness one of them, and said the names of the three women were on the papers, and asked witness to write the names on a separate piece of paper, which being done, he said it was all right, and repeated, "to them for life, one dead, the other two, two dead to the other one, all dead, then to three other women down there," pointing to the Southeast, that witness not understanding him, he again expressed great pain, and

said with great earnestness, "fathers, fathers," and witness thought, added, "children or daughters," that witness not knowing who he meant by "fathers," inquired of the servant who accompanied the testator, who he meant, to which the servant replied that he did not know, unless he meant Mass Gus Kenan, that witness then asked testator if he meant Col. Augustus H. Kenan's daughters, and he said yes, and told witness to write it down, and placing his hand on his breast said, "one, my name," that witness then wrote the names of Col. Kenan's three daughters on a separate piece of paper, and testator took the paper, read it, and said it was all right; testator was particular in requesting that the negroes aforesaid should be well treated, sufficiently fed and clothed, and kept together in families, unless some of them should steal or otherwise misbehave, and in that event, they might be sold, that he then requested witness to put the whole clause relative to this parcel of negroes in writing, which witness did, and testator after reading it, expressed himself highly gratified that he had been understood, and said, that it was just as he had wanted it. The witness further testified, that he had little or no difficulty in understanding the testator's wishes in regard to the *fourth, fifth* and *sixth* items of the will, that he had considerable difficulty in understanding his wishes relative to Miss Stark, that the testator described her as having his name, and being the daughter of a gentleman who was dead, and had had the office of Clerk or some other office, that witness mentioned one gentleman who had been Clerk, and was dead, but testator promptly rejected that as the name, that testator first having pointed toward Marietta, and then below, for the town of the residence of her father, witness called the names of several towns, Marietta, Atlanta, Jonesboro, and Griffin, when the testator said he thought the latter was the place, that after reflecting a moment, witness remembered that Judge Stark married Mrs. Kenan's neice, and mentioned his name, and testator said yes, and asked the name to be written, and witness wrote on a piece of paper, the name of the legatee, Martha Owen Stark, which being read by testator, he said yes, that is all right, she is to come

in with the rest, after the death of the three first, that testator looked over the will, read it, and not only approved it, but expressed himself highly gratified, that he had been understood, and as often as twi&e, said, that he knew witness could do it, that witness had known testator for forty years or more, previous to his death, and was well acquainted with him.

There was a large number of witnesses sworn on the trial of the case, but as the points established by their testimony, are very fully stated in the opinion of the Court, so well delivered by Mr. Justice Jenkins, the Reporter deems it unecessary to go further into a detail of the facts proved, than he has already done.

When the testimony had closed, and the counsel for caveators was making the concluding argument to the jury, he commented at length upon a written charge of the presiding Judge, delivered to the jury on the occasion of a former trial of the case, when the jury failed to agree upon a verdict.

The action of the Judge with reference to this matter, is complained of, as will be hereafter stated.

The presiding Judge charged the jury *in extenso* as follows

"The question for your consideration is, does the paper propounded, contain the last will and testament of Owen H. Kenan, late of this county, deceased? The propounders say it does; the caveators say it does not, and the decision of this question is now to be made by you, under the law and evidence. The caveators say, the paper does not contain the will of deceased, because at the time of executing the paper, he was not of capacity sufficient to make a will, and this is the great question in this case. What was the capacity of Kenan's mind at the time of making the will, say 10th of January 1860? Testimony has been introduced to show the condition of his mind at various other times, the object of which was to shed light upon the state of his mind when the will was made, for that is the point of time to which your investigations are to be directed. The condition of his mind at other times may be considered in aid of ascertaining what was its real condition at the time of executing the will. You

should consider all the evidence introduced before you, and from that, decide whether, *at the time of executing the paper propounded*, he had sufficient capacity to make a will, for that is the *point of time* to which your investigations should be directed. What amount of capacity is sufficient to make a valid will, is one of very difficult determination ; for such is the peculiar character of the human mind, such is the difference in the intellectual powers of man, so varied in its operations, that in any particular case, it is usually exceedingly difficult to decide, when capacity ceases, and incapacity begins. The law presumes every man sane, and the burden of proving any one incapable of making a will devolves on those asserting such incapacity. Now does the proof establish such incapacity at the time of executing this paper ? It is not denied by caveators, that deceased, up to the time of his affliction a few years ago, was of sound disposing mind and memory, but they insist that by reason of that affliction, his mind was impaired, and at the time of making his will, had rendered him incapable of making a will. The previous condition of Kenan's mind, his habits, his peculiarities, eccentricities, and in fact, all his traits of mental character, as shown by the testimony, are proper for your investigation in arriving at what was the condition of his mind subsequent to his affliction, and up to, and especially at the time of making the paper. I know of no general rule as to the sufficiency of evidence of capacity applicable to each case; each case must be determined by its own peculiar circumstances. In this case you are to determine upon the capacity of Owen H. Kenan to make a will, and the testimony is to be viewed in its application to his mind. Our Supreme Court says : ' neither eccentricity, nor imbecility, nor extreme old age, nor being deaf and dumb, whether from birth, or the calamity be superinduced, nor incapacity to make contracts for the purchase and sale of property, are sufficient to invalidate a will.'

"The words *non compos* (of unsound mind) are legal terms and import a total deprivation of understanding. What is meant by the phrases, 'of sound and disposing mind and

memory,' and ' of capacity sufficient to make a will?' They amount to and mean about the same thing, and are defined by the law to be, that the testator must be possessed, at the time of the execution of the will, of a sufficiently active power of memory to collect and retain the elements of the business to be performed, for a sufficient time to perceive their obvious relation to each other. In other words, a disposing mind and memory, is a mind and memory which have the capacity of recollecting, discerning, and feeling the relations, connections, and obligations of family and blood. It is when a man is capable of making his will, with an understanding of the nature of the business in which he is engaged, a recollection of the property he means to dispose of, of the persons who are or might be the objects of his bounty, and the manner in which it is to be distribued amongst them. It is not necessary that he should view his will with the eye of a lawyer, and comprehend its provisions in their legal form. It is sufficient if he have such a mind and memory as will enable him to understand the elements of which it is composed, and the disposition of his property in its simplest forms. In deciding upon the capacity of the testator, it is soundness of the mind, and not the particular state of his bodily health, that is to be attended to. The body may be in a state of extreme debility, and yet he may possess sufficient understanding to direct how his property shall be disposed of. A testator must have some memory; for a man in whom this faculty is wholly extinguished, cannot be said to possess an understanding to any degree whatever, or for any purpose. But his memory may be very imperfect, it may be greatly impaired by age or disease, he may not be able at all times to recollect the names, the persons, or the families of those with whom he had been intimately acquainted, he may at times ask idle questions, and repeat those which had before been asked and answered, and yet his understanding be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of mind, and vigor of intellect to make and digest all the parts of a contract, and yet be competent to direct the distribution

Stancell, ex'r, *vs.* Kenan *et al.*

of his property by will. This is a subject which he may possibly have often thought of, and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. The question is not so much what was the degree of memory possessed by the testator as this; had he a disposing mind and memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole, were his mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged at the time when he executed the will? It is not essential to the legal capacity of a testator to make a will, that he should be capable of managing business generally; it is enough, if in the making of his will, and at the time of making it, he understands what he is doing. To make the will valid, the testator at the time of dictating the will, must have had sufficient discretion, and at the time of executing the will must have been able to recollect the particulars which he had dictated, and at the time, understood what disposition he was making of his property, and to whom; that he must have been capable of understanding the nature of the business in which he was engaged, and the elements of which the will was composed, and the disposition of the property as therein provided for, both as to the property he meant to dispose of by his will, and the persons to whom he meant to convey it, and the manner in which it was to be distributed amongst them.

To apply the principles more particularly, in this case, did Judge Kenan comprehend the contents of this paper as his will, the nature of the estates he was conveying to his family connexions and others, their relative situation to him, the terms upon which he stood with them, his own situation, and the circumstances which surrounded him? Were these and like objects, though seen by him, as through a glass dimly, by reason of the infirmity of age or other causes, contemplated by his mind with a steady though subdued light? These are all matters for your consideration and determination. From all the evidence then, does the paper propounded

contain the last will and testament of Owen H. Kenan, deceased, or not? If from the evidence in the case, you believe that it is his will, find for the propounders—if you think it is not his will, find for the caveators."

The jury returned a verdict against the paper, as the last will and testament of the said Owen H. Kenan.

Counsel for the propounders then moved for a new trial, on the grounds following, that is to say:

1st. Because the verdict of the jury was against the law and the evidence in the case.

2nd. Because the verdict of the jury was decidedly, and strongly against the weight of the evidence in the case.

3d. Because the charge of the Court, taken as a whole, was erroneous, and calculated to mislead the jury. (Certain specified parts of the charge were excepted to, but as the Supreme Court did not pass upon the grounds for a new trial in that form, they are omitted.)

4th. Because the Court had written out the foregoing charge, and permitted the attorney making the concluding argument to the jury for caveators to read, and comment on it to the jury at length, telling them, that it would be given in charge as the law, and when the attorney who made the concluding argument for the propounders, commenced addressing the jury, the Court asked for the paper on which the charge was written, and when the argument was closed, then read said charge to the jury, as the law of the case.

5th. Because while the case was progressing, and the evidence being heard, and the argument being made, and after counsel for the propounders had privately applied to the Court to keep the jury together, stating as a reason for the request, that they believed an effort had been made, on the former trial, to tamper with the jury, the Court allowed the jury to disperse during the recess of the Court, and at night. This application was made to the Court and not communicated to the opposite counsel, the Court controlling the matter without consulting them, but the Court did caution the jury against talking, or being talked to, about the case in

Stancell, ex'r. *vs.* Kenan *et al.*

any way.  After the Court charged the jury, they were kept together until the verdict was rendered.

The presiding Judge overruled the motion, and refused the new trial, and that refusal is complained of as error.

AKIN, A. H. KENAN, JOHNSON, and JACKSON, for plaintiffs in error.

WM. DOUGHERTY and DABNEY, *contra.*

*By the Court*—JENKINS, J., delivering the opinion.

This case comes before us upon exception to the judgment of the Court below, refusing to grant a motion for a new trial, and error is assigned on each ground taken in that motion.  Leaving the first ground to be last considered, we dispose of the others, in the order in which they are stated. Deeming it unnecessary to examine in detail the several exceptions taken to the charge given to the jury, we consider them as expressed in general terms, thus : " the charge of the Court, taken as a whole, was erroneous, and calculated to mislead the jury."

1st.  The object of the presiding Judge was to instruct the jury, what in law constitutes testamentary capacity, for the great question in this case was, had the testator such capacity ? We premise that all he may have said, and all we may say, must be taken apart from cases of idiocy, and of established insanity, and from all cases of supposed improper influence, and must be applied only to cases of alleged *impairment of mind by age or by disease.*

From a careful review of the charge, we cannot say that it is erroneous.  There is in it, we incline to think, no proposition that is not sustained by authority.  It is, perhaps, too much amplified—the same idea repeatedly presented—. sometimes more, and sometimes less, elaborated.  The object was, to fix in the minds of the jurors the idea intended to be conveyed by the terms " sound and disposing mind and memory," as constituting testamentary capacity.  In any attempt to convey this idea to a mind unlearned in the law,.

Stancell, ex'r. *vs.* Kenan *et al.*

amplification is apt to produce confusion, although it may not lead in a wrong direction. Simplicity and brevity are indispensable to complete success. Our impression is, that the following, or something very like it, would best accomplish the object. A person has testamentary capacity, who understands the nature of a testament or will, viz: that it is a disposition of property, to take effect after death, and who is capable of remembering generally, the property subject to his disposition, and the persons related to him by the ties of blood, and of affection, and also of conceiving, and expressing by words written or spoken, or by signs, or by both, any intelligible scheme of disposition. Harrison vs. Rowan, 3 Wash, C. C. R., 580; Kirkwood vs. Gordon, 7 Rich., 379; Potts *et. al.* 11 Ga. R., 33.

In the elaborate charge given by the Court below, we find nothing inconsistent with this test, nothing establishing a higher or lower standard of testamentary capacity, and therefore no ground for reversal.

2nd. It appears, that on a former occasion, when this case was before the Court below, the presiding Judge delivered a written charge to the jury; that after a mistrial, that document remained among the Court papers of the case, and that on the recent trial, one of the caveators' counsel, in his argument to the jury, read it to them, stating that it was the charge which the Judge had once given in this case, and which he would give again, and this being permitted by the Court, is made a ground of the motion for a new trial. It is not pretended that the paper was furnished by his Honor, to the counsel, to be thus used: it came accidentally into his hands; and he was permitted (no objection being made) to read it. Unquestionably the right practice is, that nothing, in the nature of instruction to the jury, should pass from the Court, until the argument shall have been concluded. But if counsel, from notes taken by him on a former trial, or from his recollection of the charge of the Court as then given, rehearse it to the jury, and assume that it declares the law of the case, there would seem to be no good reason for arresting him, and prohibiting that course. Upon principle, we do

Stancell, ex'r. vs. Kenan et al.

not see that the use of the notes made by the Judge himself, would make the matter worse. It is a question of propriety between the counsel and the Court, in which the interest of the opposite party is not at all involved.

The Judge had the opportunity of correcting any error that may have been made, either in the reading of counsel, or in the charge itself, should his opinion have undergone any change. We do not suppose that any Judge would be likely to introduce such a practice, or to furnish voluntarily, facilities for so doing, but the occurrence is not of so grave a character as to entitle the party to a new trial.

3d. The Court was asked to grant a new trial, because the jury were permitted to separate during the recess taken by the Court, pending a very long trial, including adjournments from day to day, notwithstanding counsel for the propounders privately requested the Judge to keep them together. The private request here mentioned, gives no additional force to the exception taken. This Court will never review anything which transpires privately in the court room, between the Court and counsel—will take no cognizance of such a request, because it can evoke no judgment or decision of the Court.

Is it then erroneous in the Court to permit a special jury, engaged in a protracted trial of a civil cause, to separate whenever the Court takes a recess for necessary refreshment, no motion being made contra, or cause shown for not doing so? We think not. It is a matter of practice that may well be submitted to the sound discretion of the Court, the usual caution being given to the jurors not to converse with any one touching the case during such separation.

4th. We come now to the principal ground upon which the motion for a new trial rests, viz., that the verdict is contrary to law, and the evidence, and strongly and decidedly against the weight of the evidence. The great question in the case is, whether or not, in view of all the evidence, the testator had, at the time he made his will, testamentary capacity. It is not pretended that he was either idiotic or lunatic. He was a man of fair intellect, had been bred to and

had practised the law, had been called to the bench of the
Superior Court, had managed his affairs prudently and well,
and had accumulated a considerable fortune. He was not
superannuated, nor was he at the time he made his will suf-
fering from great physical debility, having travelled nearly
one hundred miles to the residence of his chosen scrivener,
and having continued after the execution of his will to jour-
ney yet further from home, attended only by a servant—one
of his own slaves. He had had residing with him, for some
time anterior to his death, a young man, who wrote for him,
and attended to some extent to his business, but even down
to his last illness (of but a few days' duration) he gave to it
his personal attention and active supervision, buying and
selling, loaning and collecting money, etc., etc. Indeed, his
business transactions were either conducted by himself, or, if
done by lawyer or agent, were carefully and intelligently
reviewed by him. Throughout his life, in character, in
mind, and in manners, he manifested striking peculiarities,
amounting to eccentricities. He was particularly remarkable
for strong will, for independent thought, and frank expres-
sion of opinion upon all subjects, and for ardent friendships
and aversions. For years prior to, and at the time of his
death, he had neither wife nor child, but numerous collateral
relations. About five years anterior to his death, he was
stricken with paralysis, the first shock of which prostrated
both his physical and mental energies. Having a vigorous
constitution, he in a comparatively short time rallied, and
regained a very comfortable degree of health and strength.
His mind, too, measurably recovered its wonted strength and
activity, but to what extent we have now to inquire. That
*all of its faculties* were never after restored to antecedent
vigor, may be conceded as a fact established by the concur-
rent testimony of all the witnesses. It is to this interval,
between the shock of paralysis and his death, that our pre-
ceding remarks relative to his business habits apply. Such
was the man, his circumstances and connections in life, whose
testamentary capacity we are to consider. The Ordinary of
the county wherein he resided at the time of his death,

granted probate of a paper purporting to be, and propounded in common form, as his last will and testament. Subsequently, the executors were cited to prove it in solemn form, and upon presentation of their allegations, certain of the heirs-at-law of the deceased filed a caveat against the probate of the will, on the ground that the testator, at the time of making it, was not of sound and disposing mind and memory, and that the paper propounded was not his last will and testament. The Ordinary, after a hearing, gave judgment for the paper propounded, and the caveators appealed to the Superior Court of Whitfield county, where a verdict was rendered by a special jury, that the paper propounded was not the last will and testament of the deceased. The brief of evidence filed in the Court below, with a motion for a new trial, and coming up here with the record, is voluminous, many witnesses having been examined. The question to be determined is, had the deceased testamentary capacity at the time the paper propounded was made? Much of the evidence, however, relates to his condition before and after that time; indeed, it covers the entire interval between the paralytic attack and his death. There are particular incidents testified to, by highly credible witnesses, that deserve to be noted. Having made a previous will, with which he became dissatisfied, and which he determined to revoke, he called together the subscribing witnesses, declared to them his dissatisfaction with it, and in their presence destroyed it. He engaged a neighbor and friend, who had written that will, to write another for him. But before he found it convenient to attend to the engagement, that friend left the neighborhood, expecting to be absent several months. Deceased then went a distance of nearly one hundred miles, to one who had been his friend from early manhood, one learned in the law, distinguished for ability, integrity, and amiability, and invoked his aid. The task, a difficult one, owing to his infirmity, being accomplished by mutual patience and perseverance, he expressed great gratification, and exclaimed exultingly, "*I knew you could fix it.*" Taking possession of the will, after execution, and returning home

after several days, he summoned to him the two persons named as executors, and exhibited to them that clause of the will, and urged their agreement to accept the trust. This obtained, he subsequently counted with them his money, being fourteen thousand, two hundred and fifty dollars in gold. It was first put into parcels of equal value, then those parcels counted, and by a short arithmetical process, the aggregate was ascertained. One of the executors named, made this calculation, and stated the result. Whereupon, the deceased said, "That is not right; mistake, sir;" and by inspection of the parcels, *he* discovered one to contain one piece too much. The value of the piece being added to the result previously attained, the deceased said, "that is right." This occurred between the making of the will and his death, the whole interval being seventeen days.

There are other incidents, supposed to indicate great mental infirmity. On one occasion he ordered the wagon of a visitor to be put into the stable and fed; on another, speaking of fowls, he called them mules; on another, he offered fifty cents a piece for ducks, the market price being ten cents; on still another, being met and addressed by a neighbor, he exclaimed, "who are you?"

Again, being invited to a settlement of mutual accounts, he postponed it on account of the absence of the young man who resided with him, and attended to his business occasionally. Also, on one occasion, (probably immediately after the execution of the paper propounded,) whilst traveling in a railroad car, he talked in a voice so loud, and in a manner so boisterous and incoherent, passing rapidly from one subject to another, that the witness thought him deranged. There are, doubtless, other incidents testified to, of more or less significance, but these are cited as most significant on each side. The following points may be considered as established by an overwhelming weight of evidence, drawn from the witnesses of both parties: That during the time he was affected with the infirmity which brings his testamentary capacity into question, he did buy and sell, and transact business generally, and in all this, did manifest a large degree of prudence

Stancell, ex'r, *vs.* Kenan *et al.*

and sagacity; that his judgment, as to the quality, value and ruling prices of articles he bought or sold, was good; that he discriminated between different currencies, precisely as he had done before his affliction; that he made calculations, and reviewed those made by others, with accuracy; that he continued to the last a keen and sagacious trader; that he had great difficulty in expressing his thoughts, seeming unable to command language, forgetting the names of persons and things; that he was always glad to have aid from his collocutor, promptly adopting or rejecting any conjectural statements of his meaning, always manifesting by his promptness and decision that he had a clear and distinct idea in his mind, for which he would allow no other substitute; that if, for lack of change, he could not pay promptly for an article purchased, (as was his wont,) he would, days after, wait upon the seller, with the exact amount due; that he invariably knew and appreciated his own property; that he almost without exception knew his friends and acquaintances, though seldom able to recall their names; that he remembered his relations, and frequently spoke of them—of some with favor, and of others with disfavor or indifference; that at times he seemed to have difficulty in connecting and comprehending long sentences addressed to him orally, but read with facility, and understood readily and perfectly what was written. One witness, who disbelieves his testamentary capacity, uses the singular expression, that " the mind of the deceased seemed to be in his eye," forcibly conveying the idea that what he saw he perfectly understood. The witnesses, in so far as their expressed opinions are concerned, may be arranged into three classes: 1st, the subscribing or attesting witnesses; 2d, professional or medical witnesses; 3d, all others testifying to that point. The subscribing witnesses, so far as examined— among whom was the draftsman of the will, an acquaintance and friend of the deceased from early manhood—concur in opinion, that he had testamentary capacity. Of the medical gentlemen testifying, few knew him intimately, or had much intercourse with him. Some believed that he had, and others that he had not such capacity, and still others doubted.

Dr. Rosenburg, who was his family physician, who attended him when stricken with paralysis, and in his last illness, and who was in constant intercourse with him during the interval, is decidedly of the opinion that he was capable of making a will.   The other witnesses are divided in opinion, the numerical preponderance being small either way.   But there is this material fact, giving preponderance to those holding the affirmative, viz: that, as a general rule, (deducible, as regards each witness, from his own testimony,) those who knew him best—had most personal association with him, and most numerous business transactions—were of this class.   Therefore, after careful analysis, we conclude that the verdict is not sustained by opinion emanating from the witness's stand. The weight of opinion is against.   But this is not conclusive. The opinions of witnesses are but aids to jurors in the formation of their own.   Theirs is the prerogative of looking beyond, to the facts disclosed by the witnesses as to the basis of their judgment.   To these facts, then, we turn.   And first, we notice particular incidents, relied upon by the caveators. He called a horse a wagon, but there is often an intimate connection between the two, and to the horse, unfortunately misnamed on this occasion, there may or may not have been a wagon attached.   Certain it is, that it is often said of persons never suspected of mental derangement, nay, even of wise men, that they put "the cart before the horse."   Shall this man's mind be condemned as unsound because, on that occasion, he put the *cart for* the horse?   He called fowls mules.

It will be remembered that, as shown by the testimony, he was eminently a man of hobbies, in his best condition, and that the raising of poultry and mules were among his favorite projects.   Hence the connection.   No witness, however, testifies that he ever offered the price of a mule for a fowl, or plead the value of a fowl as the price of a mule he wished to sell.   He did, however, offer fifty cents per head for ducks, whose market value was ten cents.   But it will be remembered that this was a rare variety of ducks, which he desired to introduce to his poultry yard.   It fell in with one of his hobbies.   He doubtless wanted to present an irresistible temp-

tation, which, however, the possessor did resist.    He inquired
rudely of a neighbor who saluted him, " Who are you?"
The idea is, that he failed to recognize a man who should
have been well known to him.    But does this never happen
to sane men ?    May not this interrogatory have been his
mode of inquiring the name of one whose person was recog-
nized, whilst the name could not be recalled ?    On one occa-
sion he postponed a settlement of accounts until he could
have the presence and aid of his man of business, and this is
relied upon as evincing a consciousness that he could not
understand accounts and make settlements ; but this is easily
and naturally referable to his consciousness of the difficulty
of making himself understood.    This would alone seem to
furnish a reason for devolving upon his stated agent all
affairs of that nature, admitting of postponement.    Regard-
ing his conduct on the car, it may be said that he had always
been remarkable for eccentricity of manner, and for passing
abruptly from one subject to another.    To these superadded
the embarrassment resulting from his forgetfulness of words,
and it will not be surprising that one not familiar with him,
and not then conversing with him, should have thought him
deranged.    Indeed, the inevitable effect of his infirmity was
to exaggerate his eccentricities.    These incidents, considered
in connection with those prominent peculiarities, and the
supervening infirmity, are reconcilable with entire sanity,
and ordinary business capacity.    Waiving a discussion *seri-
atim* of incidents of an opposite character, before recited, I
deduce from these the following influences, viz: That the
deceased had a settled purpose, not to die intestate ; that he
bestowed much reflection upon the making of his will ; that
he was careful to obtain efficient aid in carrying into effect
that purpose ; that he carefully guarded against any difficulty
that might arise from the existence of a prior will ; that he
showed forecast and discretion on obtaining from the execu-
tors, named in the paper propounded, a promise to accept the
trust ; that he wished to insure security to the unusually large
sum of money on hand by counting it in their presence ; that
he either had ascertained beforehand, and accurately remem-

bered the gross sum, (though considerable, and consisting of many pieces,) or that during the count he made a correct enumeration of it, promptly rectifying a mistake made by his man of business, and himself discovering how and where it occurred. These are worth something in the estimate of testamentary capacity. Recurring to the summary of the evidence, as to his general condition, the conclusion is inevitable that he was by no means oblivious of persons and things wherewith he had been previously conversant; that he correctly estimated qualities, values, and prices of articles in which he dealt; that apart from the difficulty of communicating with others, he had abundant capacity for transacting business, and remembered its details well. There is no evidence whatever that his judgment was impaired, his moral sense blunted, or his natural affections prerverted, by the ordeal of suffering through which he had passed. In what, then, had he been endamaged? His *memory* was impaired. But, it is argued, this faculty has an important part to act in the grave business of making a testament. This is certainly true, but it is not every impairment of memory that disqualifies for the office. The human mind is curiously and wonderfully constituted. The study of it (a most interesting and important science) has developed and fixed with great certainty some of the laws which govern its action. Among others, these truths are well established, that those capabilities which are denominated mental faculties, are found to exist in different relative degrees in different minds—some being, in respect of the faculties, better balanced than others; that the impairment of one faculty is not necessarily or invariably attended by like impairment of others; that some of these faculties are themselves complex, acting with far greater power and precision in some departments than in others equally within their proper functional range, and that their power in one of these departments may become impaired without causing diminution in another. Let us exemplify: Memory, by which man is enabled to recall past events and impressions, is not a simple faculty. We discriminate often (and are fully warranted in so doing by experience and ob-

Stancell, ex'r, *vs.* Kenan *et al.*

servation) between memory for faces, for places, for ideas, for words and for numbers. Every mind, not positively deficient, has each of these memories, so to speak, in a greater or less degree, and probably no mind ever had them all in equal degrees. One retains, in perfect fidelity, the faces of former acquaintances, however little known, and evinces recognition on unexpected meeting, but is utterly unable to recall the names appertaining to them respectively. Whilst another is utterly oblivious of faces until aided by names. Some children (said to be highly endowed with mathematical talent) will, by a purely mental process, multiply twelve figures by twelve other figures, arbitrarily stated. Now, this process requires accurate memory of the exact collocation, not only of all numbers in the sum stated, but of all produced in the process of multiplication, without which the final process of addition could not be performed. Now, this mental operation, to others, having perhaps in other departments superior memories, would be an utter impossibility. These remarks will, perhaps, suffice to illustrate a proposition necessary, in our opinion, to a proper decision of the question presented by the record, viz: That memory is a complex faculty of the mind, and that it may be deficient by nature or from casualty, in some of its functions, and vigorous in others.

When, therefore, the testamentary capacity of an individual is questioned because of a failure or impairment of memory, it becomes necessary to inquire into the nature and extent of that impairment, in order to determine whether or not there be enough remaining to answer the requirements of the law in the performance of a testamentary act. The evidence in this case has produced in our minds a clear and firm conviction that the injury done to the mind of the deceased by paralysis, was *the impairment of his memory for words*, or as it is more technically styled, his *verbal memory*. Beyond this, we see no evidence of mental derangement. His memory for and his judgment of persons and things seems to have suffered no detriment. Recurring to the test adopted by us in the early portion of this opinion, we remark 1st,

there is not a shadow of doubt that the deceased understood the nature of the instrument he was making; 2d, that he was capable of remembering *generally* the property subject to his testamentary disposition, and the persons related to him by the ties of blood and of affection. Respecting such persons, this is evinced by his having repeatedly spoken, not long anterior to the execution of his will, of his relatives, as well those separated from him by time and space, as of others, and of his having mentioned some with different degrees of favor, and others with disfavor. And it is noteworthy that the latter class are unprovided for in his will. 3d, That he was capable of conceiving an intelligible disposary scheme, and on this point the instrument itself, in the total absence of evidence that he was aided in framing the scheme, speaks for him. It does not appear from the full, clear and unbiased narrative of the distinguished draftsman, that *he* had any agency in framing the scheme. The only suggestion delicately offered by him, looking to the benefit of a particular kinsman, was promptly rejected. If evidence is to be credited, the scheme was all his own, and it is both intelligible and practicable, in reason and in law. 4th, That he was capable, by words spoken and written, and by signs, of expressing the scheme he had conceived. It is just here that, from the peculiar infirmity of his memory, if anywhere, we expect to encounter incapacity. Yet who that reads attentively and without bias the testimony of Judge McDonald, can doubt that, by the patient and persevering use of all those appliances, the deceased successfully conveyed to him what he wished done? The task was a difficult one, but not impossible, and the evidences of success are overwhelming.

What he found difficulty in imparting, he required first written, when understood, upon a scrap of paper, and submitted to his perusal, and, if approved, put into the rough draft, then again read to him and by him, and finally had the fair draft read to him before executed. The testimony is conclusive, that what he read he clearly understood, and that he read, or seemed to read, the whole draft. Further-

more, he indulged in lively expressions of gratification that his wishes had been accomplished. The brief of testimony, in this case, does not present the ordinary aspect of conflicting evidence. It is a conflict of opinion, rather than of fact, among the witnesses. Hence we feel less reluctance than usual in disturbing the verdict of a jury upon this ground.

If the jury concluded that the mind of the deceased was materially weakened beyond the impairment of verbal memory, our opinion is, that their verdict was strongly and decidedly against the weight of evidence.

If they entertained our view on this point, then we think their verdict was contrary to law, and in either case the judgment of the Court, refusing to set it aside, must be reversed.