## SLAUGHTER *v.* HEATH, and *vice versa*.

1. A person has testamentary capacity who understands the nature of a testament or will, viz., that it is a disposition of property to take effect after death, and who is capable of remembering generally the property subject to disposition and the persons related to him by the ties of blood and of affection, and also of conceiving and expressing by words, written or spoken, or by signs, or by both, any intelligible scheme of disposition. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice.

2. If, on the trial of an issue formed by a caveat to the propounding of a will, the judge fully and fairly charges the law on the subject of testamentary capacity, it is not necessary that he should, on requests to charge, repeat and reiterate in different forms or modes of expression what has been already sufficiently given.

3. Where the court, in defining testamentary capacity, contrasted weakness of intellect with imbecility, and was requested to define that term to the jury, but declined the request so made, and afterwards granted a new trial, although one had previously been granted; and where this ground coupled with others in the motion for a new trial was sufficient to authorize its grant, this court will not reverse such ruling.

4. Where counsel for propounders of a will invoked a charge to the effect that a testator might bequeath his entire estate to strangers, to the exclusion of his wife and children, there was no error in adding that in such a case the will should be closely scrutinized, and, upon the slightest evidence of aberration of intellect, probate should be refused. But where

the court went further and gave in charge as a qualification of the request other parts of section 3258 of the Civil Code, not applicable, including references to collusion, fraud, undue influence, and unfair dealing; and where he afterward granted a new trial on this, among other grounds, some of which also had merit, such grant will not be reversed.

5. An inquisition of lunacy and a return that the person sought to be declared insane or an imbecile was not so, with an entry of the ordinary confirming such return, is not conclusive evidence against third persons who were not parties to the proceeding, although notified thereof as next of kin.

6. A non-expert witness can state all the facts he knows in relation to the testator, bearing on the state of his mind and the nature of his acts, and may give his opinion, based on such facts, as to the condition of the testator's mind. But it is not competent to ask him such questions as, to state whether in his opinion the testator had a decided and rational desire when he made the will, or whether his desires were like the ravings of a madman or the pratings of an idiot, or a childish whim.

7. Where a female witness testified that a testator whose capacity was in question had applied to her to write his will, and she had refused, it was competent, as explanatory of his act, to show that she had drawn several wills, if that fact had been communicated to him; but it was not competent for her to state generally that this was known to him.

8. In civil cases questions of law are to be argued exclusively to the court, and not to the jury. There is no rule which requires the jury to be sent out while such an argument is in progress before the court, or which declares that, in the course of an argument to the court, the law shall not be read in the hearing of the jury. But such matters must rest largely in the discretion of the presiding judge.

9. Upon the trial of an issue arising upon the propounding of a will and a caveat thereto, the burden, in the first instance, is upon the propounder of the alleged will to make out a prima facie case, by showing the factum of the will, and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and, in making it, acted freely and voluntarily. When this is done, the burden of proof shifts to the caveator.

10. A general interrogatory which calls on the witness to state any other facts which will benefit the propounders of a will, as fully and particularly as if specially interrogated in relation thereto, is too indefinite to put the adverse party on notice as to the testimony sought, and also leaves the witness to decide what will be beneficial. On objection, such an interrogatory and the answer thereto were properly excluded. And this is true although another part of the question might have been admissible if it had not been inseparably connected with the above-stated objectionable question, so as to form with it a single question.

11. Where a testator bequeathed to a daughter only five dollars, and in the will assigned as a reason therefor that her husband had not treated him justly, evidence to show the transaction between them or the conduct of the son-in-law in respect thereto, in so far as it was known to him, was admissible as tending to show what operated on his mind. If the son-in-law withheld money from him (whether rightfully or wrongfully), and

this was known to him, it would be admissible, as throwing light on the reason assigned in the will.

12. So, for a like reason, evidence was admissible that the testator asked. his son-in-law for a bond, to which he claimed title, and that the son-in-law, with an oath, replied that he would give it to the testator when he pleased.

13. An opinion of a non-expert that a testator was not easily influenced, if relevant, was not admissible, without stating the facts on which such opinion was based.

14. Where it was sought to show the testator's sanity by proving the fact. that he had written letters to one of his daughters, this could not be. done by parol, without producing or accounting for the letters.

15. None of the other grounds of the motion required a new trial.

Submitted July 18, 1906.—Decided February 27, 1907.

Appeal—probate of will.     Before Judge Reagan.     Butts superior court. December 21, 1905.

*R. R. Arnold* and *Y. A. Wright,* for Slaughter.

*N. E. & W. A. Harris, T. J. Dempsey,* and *O. M. Duke,* contra.

LUMPKIN, J. 1-3. The motion for a new trial contained twenty-two grounds. It was granted on five of them; the others were overruled. Both sides excepted. It was a second grant of a new trial. Several of the grounds are based on refusals to charge as requested, to the effect that in order to destroy testamentary capacity there must be "a total deprivation of reason;" that to bring about that result the testator must be non compos mentis, and that the law defines a person non compos mentis to be "one wholly deficient in understanding, or who by grief, sickness, or other accident has wholly lost his understanding;" that he must be, "totally deprived of his reason;" and that "if his mind was not totally eclipsed or entirely extinguished, he had sufficient capacity to make a will." Did the presiding judge err in refusing to give these requests in charge?

Various attempts have been made to establish some arbitrary test of testamentary capacity; but they have each had to be abandoned or modified as new combinations of facts arose in later cases. At an early date the English courts entertained the view that it was not required that one should be mentally perfectly sound in order to make a will, and that a delusion not of a kind to affect the will would not render it invalid. Dew *v.* Clarke, 5 Russ. 163. Then they seemed to incline to a narrower view. Waring *v.* Waring, 6 Moore, P. C. 341, 12 Jur. 947; Smith

*v.* Tebbitt, 16 L. T. R. 841. Then they returned to their original position that testamentary capacity was not the same thing as perfect sanity. Banks *v.* Goodfellow, 39 L. J., Q. B. 237, 22 L. T. 813, L. R., 5 Q. B. 549; Smee *v.* Smee, L. R., 5 P. D. 84, 49 L. J. P. 8; Goods of Bailey, 31 L. J. P. 178, 4 L. T. 477; Murfett *v.* Smith, 57 L. T. 498. The American courts have generally held that perfect mental soundness did not furnish the test; but that there may be partial insanity, disconnected from and not affecting the making of the will, which would not render it invalid. It has sometimes been sought to apply the same test as in criminal cases. But this will clearly not answer, since "criminal capacity involves primarily the ability to distinguish right from wrong; while testamentary capacity involves ability to understand the estate to be disposed of, the proper objects of bounty, and the nature of the testamentary act." Page on Wills, §94, pp. 108-111 et seq. It has been sometimes sought to compare capacity to contract with that to make a will. But the making of a contract with another party, where there is a consideration, a meeting of minds, an agreement to do or not to do some one or more things, may evidently involve a different amount of mental capacity from the making of a will, where the owner of property directs how it shall go after his death. Besides, it will be found that the courts have not always agreed in defining contractual capacity. Page on Wills, §96; Gardner on Wills, 106. In some States there are statutes along this line. Our own code declares, "An incapacity to contract may coexist with a capacity to make a will." Civil Code, §3268. It has been said in an early authority: "So also an idiot, i. e. such a one as can not number twenty, or tell what age he is, or the like, can not make a testament, or dispose of his lands or goods; and albeit he do make a wise, reasonable, and sensible testament, yet is the testament void. But such a one as is of a mean understanding only, that hath grossum caput, and is of the middle sort between a wise man and a fool, is not prohibited to make a testament." 2 Shep. Touch., 402. Sometimes it has been added in defining or describing an idiot: one who does not know his own mother and father, or can not tell the days of the week, and the like. 1 Hale, P. C. 29; Swinb., pt. 2, §4. Obviously, however, these are purely arbitrary tests. All of us have most likely seen persons who did not

know their ages, or who from illiteracy were unable to count, but who were far from being idiots or imbeciles. And, on the other hand, Professor Gardner, in his work on Wills (p. 112), has said that "Doubtless a person who, with opportunities for learning these facts, does not acquire them, is an idiot, but an ability to do and tell these simple things would not convincingly prove that the person so capable was not still an idiot."

The mind grades up from zero to the intellectual boiling point so gradually that dogmatic tests are of little value. What is needed is a sensible, practical test, intelligible to a jury. Rejecting any arbitrary tests, and looking at the mental capacity necessary in the light of the thing to be done, viz., the making of a will, the courts now have generally reached a fairly uniform definition of testamentary capacity in the absence of special statutes. It is thus stated in Gardner on Wills, 100, sec. 31: "A testator has a sound mind, for testamentary purposes, only when he can understand and carry in mind, in a general way, the nature and situation of his property, and his relations to the persons around him, to those who naturally have some claim to his remembrance, and to those in whom, and the things in which, he has been chiefly interested. He must understand the act which he is doing, and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making his will." In Page on Wills, 114, §97, the rule is similarly, though more briefly stated. See numerous cases cited in those text books, and 1 Jarman on Wills (5 Am. ed.), 94, in note B. In Rood on Wills, §111, a like rule is laid down, and it is added: "The essential matter is power to remember; failure in fact to remember all these elements does not make the will void." See also Underhill on Wills, §87, and citations. In *Stancell* v. *Kenan,* 33 *Ga.* 56, 68, this court announced substantially the same rule, and recommended the following, or something like it, as a charge on the subject: "A person has testamentary capacity who understands the nature of a testament or will, viz., that it is a disposition of property, to take effect after death, and who is capable of remembering generally the property subject to his disposition, and the persons related to him by the ties of blood, and of affection, and also of conceiving, and expressing by words written or spoken, or by signs, or by both, any intelligible scheme of disposition."

But it is said that the words "non compos mentis" have been defined to mean a total want of mind or reason, or understanding. *Potts* v. *House,* 6 *Ga.* 325. It may be observed, in passing, that one of the cases referred to in the *Potts* case (Stewart's executor *v.* Lispenard, 26 Wend. 255) has been said to have never been received with much favor by the legal profession generally, and has since been criticised and practically overruled in Delafield *v.* Parish, 25 N. Y. 9, *27; 1 Jarm. Wills (5th Am. ed.) 93, in note A. And the case of Harrison *v.* Rowan, 3 Wash. C. C. 580, also cited in the *Potts* case, lays down a rule much like that stated above. The case in 4 McCord's Reports, 183, seems to have been cited rather to show the extreme to which the South Carolina court had gone than to approve the decision. See the remarks in regard to it in 6 *Ga.,* at the bottom of page 351. Attention is merely called to these cases, not with any desire to enter into a criticism of the opinion in *Potts* v. *House.* For the writer of that opinion, it need hardly be said, the present writer entertains the profoundest respect and esteem. In *Potts* v. *House* the expression, "a mere glimmering of reason," was used as indicating testamentary capacity. In *Terry* v. *Buffington,* 11 *Ga.* 337, 345, it was said that the court were informed that the language used in the previous case had been grossly misapprehended, and they were asked to explain what was to be understood from it. The court undertook to do this and to illustrate the meaning intended, the result being that it was held that, though the mind may be weak and dim, yet it will suffice if there be sufficient mental light "by which the testator is enabled to comprehend the contents of his will—the nature of the estate he is conveying to his family connexion—their relative situation to him—the terms upon which he stands with them—his own situation, and the circumstances which surround him." This was said by the same judge who prepared the opinion in *Potts* v. *House*; and when thus explained, it will be seen that the test of testamentary capacity laid down is very close to, if not identical with, the rule above announced. See also *Hall* v. *Hall,* 18 *Ga.* 40. In *Morris* v. *Stokes,* 21 *Ga.* 552, a charge that the testator could will his property unless totally deprived of reason was held not to be error. But the charge also stated the rule practically as above expressed. Then came the case of *Stancell* v. *Kenan,* 33 *Ga.,* supra. Then followed the code, where

sections 3266-3268 (as they are numbered in the code of 1895) read as follows: §3266: "An insane person can not generally make a will. A lunatic may, during a lucid interval. A monomaniac may make a will, if the will is in no way the result of or connected with that monomania. In all such cases it must appear that the testament does speak the wishes of the testator, unbiased by the mental disease with which he is affected." §3267: "Eccentricity of habit or thought does not deprive a person of power of making a testament; old age, and the weakness of intellect resulting therefrom, does not, of itself, constitute incapacity. If that weakness amounts to imbecility, the testamentary capacity is gone. In cases of doubt as to the extent of this weakness, the reasonable or unreasonable disposition of his estate should have much weight in the decision of the question." §3268: "An incapacity to contract may coexist with a capacity to make a will; the amount of intellect necessary to constitute testamentary capacity is that which is necessary to enable the party to have a decided and rational desire as to the disposition of his property. His desire must be decided, in distinction from the wavering, vacillating fancies of a distempered intellect. It must be rational, in distinction from the ravings of a madman, the silly pratings of an idiot, the childish whims of imbecility, or the excited vagaries of a drunkard."

In *Gardner* v. *Lamback,* 47 *Ga.* 133, 185, a charge to the effect that the terms "not of sound and disposing mind and memory" imported a total deprivation of reason was given, and this was held not to have been error. An examination of the charge which is reported shows that the judge fully gave the test laid down in the code and in the *Stancell* case in 33 *Ga.* But having in his charge employed the words "non compos mentis," he then gave a charge defining them. Judge McCay said (p. 193): "Our code [the Code of 1863], sections 2372, 2373, 2374, is in substance fairly given by the judge in his charge to the jury. Nor is the law as laid down in the code materially different from the rulings of this court in *Potts* v. *House,* 6 *Ga.* 324. To make one incapable of making a will from insanity, he must be '*non compos mentis,*' there must be a 'total deprivation of reason.' However old, feeble, weak minded, capricious, notionate he may be, if he 'be able to have a decided and rational desire as to the disposition of his property,' he is not wanting in testamentary capacity.

48

And in making the inquiry it would seem from the very words of the code that attention is to be given, not so much to the state of the mind as an abstract philosophical or medical question, as to its capacity for the precise thing in hand." Since the code and this court have laid down clearly and concisely the test of testamentary capacity practically to be applied by the jury, after fully charging and explaining the law, we think it not always calculated to greatly aid a jury to introduce technical or Latin terms merely in order to explain them. While possibly the code may not be materially different from the ruling in *Potts* v. *House,* when rightly understood and applied, yet confusion may be bred in this manner if not so applied and understood. Let us illustrate. In *Potts* v. *House,* supra, it was said, in reference to testamentary capacity, that the terms "non compos mentis" imported a total deprivation of reason. In *Maddox* v. *Simmons,* 31 *Ga.* 512, it was said that "mere weakness of mind, if the person be legally *compos mentis,* is no ground for setting aside a contract;" and in the opinion it was said that, to establish the incapacity of a grantor, he must be shown to have been non compos mentis in the legal acceptation of the term, "which means not a partial, but an entire, loss of understanding." This position has been approved several times. See *Nance* v. *Stockburger,* 111 *Ga.* 821; *Richardson* v. *Adams,* 110 *Ga.* 425; *Barlow* v. *Strange,* 120 *Ga.* 1015, 1018. Our code, § 3268, declares that "An incapacity to contract may coexist with a capacity to make a will." Now if the code has made no change, and selections from these various sources were made and indiscriminately charged as to the meaning of non compos mentis, it will be readily seen that a jury might be led into this rather paradoxical tangle: Total deprivation of reason is necessary to destroy contractual capacity; less reason is necessary to make a will than a deed,—that is, something more than total deprivation is required to destroy testamentary capacity; or something less than no reason at all will do to make a will. Of course, this can not be the law; and we merely make the illustration in connection with what we have said as to avoiding confusion in the charge. In *Barlow* v. *Strange,* 120 *Ga.* 1017, it was said, as to a contract, that a charge that "A person is insane when he or she is not possessed of mind and reason equal to a full and clear understanding of the nature and consequence of

his or her act in making the contract" was sufficient to cover a request to charge that total deprivation was necessary, and that a failure to give such a charge as requested was not ground for a reversal. If this be correct, certainly a similar ruling should be applied to a charge in regard to testamentary capacity, and no new trial should be required, where the correct test, as declared by the code and by this court, has been fully given, because of a failure to give requests to charge which were thus covered. Even the word imbecility has been used to denote different grades of mental weakness. Compare *Potts* v. *House,* 6 *Ga.* 354, 355, supra, *Morris* v. *Stokes,* 21 *Ga.* 571, supra, and Civil Code, §§3267, 3268. In the code it means complete or total imbecility, with which is being contrasted weakness of intellect less than that. The difference between imbecility, as thus used, and idiocy is generally said to be that the latter is congenital, while the former arises from subsequent causes, such as old age, disease, or accident. The insanity which we have been here discussing is general insanity, not monomania or delusional insanity.

We do not wish to be understood, from what we have said, as holding that mere weakness of intellect will authorize juries to set aside wills, if the testator has testamentary capacity as defined by law. In cases of doubt as to this, the reasonableness or unreasonableness of the disposition may be considered. But this is only to be done as evidence bearing on the question of capacity. If the testator has sufficient capacity, a jury can not lawfully set aside the will merely because they may think it unjust or unreasonable. The law does not entrust them with any such power. Speaking of the right to make a will, Judge McCay, in *Gardner's* case, 47 *Ga.,* supra, says: "It is a precious right, and one that should be guarded with jealous care, that the aged and infirm, the weak-minded and eccentric shall have this security for care and attention on a sick bed. And it may be truly said, without any harsh criticism on human nature, that many a fired brain has been cooled by gentle hands, and many a deathbed cheered and watched over with kind care, which, but for this tender care of the law for this testamentary right, would have been neglected and deserted." See also Deering *v.* Adams, 37 Me. 264, 269; 1 Underhill on Wills, §114. Inasmuch, however, as the judge had contrasted weakness not amounting to incapacity with imbecility,

as the code does, we can not say that he erred in holding that, upon request, he should have defined the meaning of imbecility as. thus used, or that this with other grounds did not authorize the grant of the second new trial. What has been said above also disposes of the sixteenth and nineteenth grounds. The general charge covered the subject, and a new trial was not necessary on those grounds.

4. The propounders' request to charge, set out in the seventeenth ground, introduced into the case the subject of the right of a testator to leave his property to strangers, to the exclusion of his wife and children, and invoked a charge to that effect. If he does so, however, the will should be closely scrutinized, and slight additional evidence of aberration of intellect may serve to set it aside. *Wetter* v. *Habersham,* 60 *Ga.* 198. But the court not only added this modification, but also gave the entire section 3258 of the Civil Code, including references to collusion, fraud, undue influence, and unfair dealing. Sometimes reading an entire section of the code will not require a reversal, although all of it may not be necessary. *State* v. *Brown,* 125 *Ga.* 281. But we will not reverse the judge for granting a new trial on this and other grounds, when he doubtless thought it might have misled the jury, and under the evidence might have worked injury.

5. Some two years before the making of the will, an application was made for an adjudication by a commission that the testator was an imbecile, and to have a guardian appointed for him. The commissioners found that he was not an imbecile. The court, on the trial of the present case arising on the propounding of the will, was requested to charge the jury to the effect that such finding was conclusive that the testator was not at its date an imbecile; that the presumption was that the same state of mind continued; and that the burden was on the caveators to show a change in his mental condition. He refused to so charge; but subsequently made this one ground for granting a new trial. Whatever may be the ruling of some courts, here it has been decided that an "inquisition of lunacy and the appointment of a guardian consequent thereon, is prima facie evidence only, and not conclusive against third persons, who were not parties to it." *Field* v. *Lucas,* 21 *Ga.* 447. This was a case involving testamentary capacity. While some of the expressions of Judge Ben-

ning in *Lucas* v. *Parsons,* 23 *Ga.* 267 et seq., may indicate possible dissatisfaction with this rule, on his part, there was no effort to overrule the former decision, but a direct affirmance of it. In *Terry* v. *Buffington,* 11 *Ga.* 337, 342, an inquisition of insanity, dated some five years after the execution of the will, was offered in evidence and rejected. This ruling was affirmed. What would have been the rule had the inquisition been before the date of the will was not involved in the case. In *American Trust Co.* v. *Boone,* 102 *Ga.* 202, 206, Mr. Justice Cobb discussed the effect of an adjudication of insanity and the appointment of a guardian as terminating the power to contract thereafter. Civil Code, §3652.

It would involve a considerable extension of an opinion already long to enter fully into a discussion of the writ de lunatico inquirendo, and the commission of lunacy. Suffice it to say that "by the common law, the king's officers, his sheriff, coroner, and escheator, were bound virtute officii to make inquiry concerning any matter which gave the king a title to the lands, tenements, goods or chattels" of an idiot or lunatic. Collinson on Idiots and Lunatics, c. XII, §§2, 29, 31, cited in 3 Wigmore on Ev. §1671. It has been sometimes suggested that such a proceeding would appear to be in the nature of a proceeding in rem, and binding on all persons. But the courts generally hold that it does not have that effect. Many decisions say broadly that the finding upon an inquisition of insanity is admissible, or is only prima facie evidence. Quite often this is coupled with the words, "against third parties," or some similar expression; though the decisions rarely undertake to define who are considered parties to the proceeding, and who are not. It seems to be universally held that where the inquisition found that the lunacy had existed for some specified time before that date, though including the time of the occurrence under investigation, such finding was admissible; but not conclusive. See 2 Black on Judgments (2d ed.), §802; Buswell on Insanity, §194, and cit.; 3 Wigmore on Ev. §1671; Woerner on Guardianship, §128; 16 Am. & Eng. Enc. Law (2d ed.), 606; Page on Wills, §402; Den v. Clark, 5 Halst. 217 (18 Am. Dec. 417); Hart v. Deamer, 6 Wend. 497. In Gibson v. Soper, 6 Gray, 279, 285, 286, a finding that the person was sane is discussed. In Hughes v. Jones, 116 N. Y. 67 (5 L. R. A. 632), Vann, J.,

reviewed the history and nature of the proceeding, and came to the conclusion that "A petitioner in lunacy proceedings is not a party to the record so as to be personally estopped by the finding of the jury, except as all the world is estopped." It is not necessary to go so far in the present case. Under the law of this State any person may institute proceedings by petition, verified by his oath. Ten days' notice must be given to the three nearest relatives of the person whose condition is to be considered, and this must be proved to the ordinary before commission issues. Civil Code, §2573. The three relatives notified are not thereby made parties in their own behalf or interest, but merely given notice to insure that members of the family of the person may be apprised of the proceedings against him. They are notified for his benefit and given an opportunity to be heard in his behalf. They are not summoned by process; no judgment can be rendered against them merely because of such notice; and there is no provision for taxing costs against them. Civil Code, §2583. After return under the commission, "the applicant for a commission, or the person for whom the guardianship is sought, or any friend or relative for him, may appeal." Whether the petitioner may be a party or not, all of the person's friends and relatives are not so, even though they are notified. What effect actual appearance or entering an appeal might have is not now for consideration. The court did not err in refusing the charge requested.

6. Several grounds of the motion complained of the exclusion of certain opinion evidence, which it is claimed would have thrown light on the question of sanity. A non-expert witness can state all the facts which he knows in relation to the testator, bearing on the state of the latter's mind, and on this basis may give his opinion of the condition of the testator's mind. But it is not competent to ask the witness such questions as, to state whether in his opinion the decedent had a decided and rational desire, or whether his desires were like the ravings of a madman or the pratings of an idiot, or a childish whim. This goes beyond the range of legitimate opinion evidence, and practically quotes a part of a section of the code and asks the witness to compare the desire of the decedent with the law, and to tell the jury his opinion of the matter. It also sets up a standard assumed to exist in the mind of the witness as to the ravings of a madman, the prat-

ings of an idiot, or childish whims, and asks him to tell the jury, not his opinion as to whether the testator was sane or insane, or what was the condition of his mind, but to compare what the witness thought of the testator's desires with the idea which he might have of ravings, pratings, and whims of a madman, an idiot, or a child, and to give his view of the reasonableness and decidedness of such desires. In some of the grounds part of the evidence, if segregated from the objectionable part, might have been admissible. But we would not reverse a trial judge for rejecting it as a whole, when as a whole it was not admissible.

7. While apparently of not much consequence, yet where a female witness testified that a testator, whose capacity was in question, had applied to her to write his will, and she had refused, it was competent to show that she had drawn other wills, if that fact had been communicated to him. But it is not competent for a witness to state merely that another person knew a thing. In the future of advancing psychology it may become possible for one person to look into the mind of another and testify what the latter knows. But at present the law treats such statements as conclusions, not facts. What was said to or by the testator would be legitimate evidence on the subject of knowledge. *Bush* v. *McCarty Co.*, ante, 308.

8. In civil cases questions of law should be argued exclusively to the court, and not to the jury. There is no rule which requires the jury to be sent out while such an argument is in progress before the court, or which declares that, in the course of an argument to the court, the law shall not be read in the hearing of the jury. But there might be circumstances which would authorize the court to regulate the matter. Reports of facts in other cases and opinions of courts sometimes contain matter which is not suited to be read to or before a jury. The control of such things is much in the discretion of the presiding judge. *Rutledge* v. *Hudson*, 80 *Ga.* 266. We deem it unnecessary to discuss the colloquy between the court and counsel in this case, as it is not likely to occur again in the same way on a new trial.

9. Error was assigned because the court refused a request to charge as follows: "Every person is presumed to be sane, until the contrary is shown. This presumption follows the testator through all the events bearing on the execution of the will." We

construe the latter part of this request to be the equivalent of saying that upon proof of the execution of a will the presumption of sanity applies. While it does not so state in terms, the result of this request as a whole would be that upon proof of execution of the will the propounders might rely on the legal presumption of sanity in the testator, and shift the burden of disproving it to the caveatrix. There is not wanting authority for this position, in the decisions of other States; and it must be frankly conceded that if sanity is the normal condition of man, and he is generally presumed to be sane, the decisions referred to are not without support in reason. In some States it has been held that this presumption does not apply to last wills and testaments, and that therefore a party propounding a will must not only prove execution, but must also offer positive proof of capacity. See Cilley *v.* Cilley, 34 Me. 162; Kempsey *v.* McGinnis, 21 Mich. 123; Williams *v.* Robinson, 42 Vt. 658, 664. Whatever may have been held elsewhere, this court is thoroughly committed to the doctrine that "upon the trial of such an issue, the burden, in the first instance, is upon the propounder of the alleged will to make out a prima facie case, by showing the factum of the will and that at the time of its execution the testator apparently had sufficient mental capacity to make it, and, in making it, acted freely and voluntarily. When this is done, the burden of proof shifts to the caveators." *Credille* v. *Credille, 123 Ga.* 673; *Potts* v. *House, 6 Ga.* 234 (1), supra; *Stancil* v. *Kenan, 35 Ga.* 102; *Evans* v. *Arnold, 52 Ga.* 169; *Thompson* v. *Davitte, 59 Ga.* 472, 475.

Some of the other grounds of the motion for a new trial are disposed of in the headnotes. Others require no discussion, and furnish no reason for a new trial.

*Judgment, on the main bill of exceptions, affirmed; on the cross-bill, reversed in part. All the Justices concur, except Fish, C. J., absent, and Beck, J., disqualified.*