## 18965. NORTHWESTERN UNIVERSITY *v.* CRISP, executor.

ARGUED MAY 9, 1955—DECIDED JUNE 13, 1955.

*Thos. O. Marshall, Jr., Dykes, Marshall & Dykes, Robert B. Troutman, Griffin B. Bell, Spalding, Sibley, Troutman & Kelley, W. K. Meadow, Ralph K. Ball,* for plaintiff in error.

*Smith & Undercofler, Foley, Chappell, Kelly & Champion,* contra.

CANDLER, Justice. (After stating the foregoing facts.) ■ The Code, § 38-2301, provides: "In all counties, either party litigant in any court of record in any such county may, without any order or commission, take the deposition of any witness or witnesses in any case, whether resident in the county or not, upon giving the opposite party five days' notice of the time and place, with the names of the witnesses. The commissioner before whom the evidence under this section is to be taken shall have power, on notice being given to the opposite party or his attorney, or on subpoena duces tecum being served five days previously to the hearing, to require any witness or party to produce, at the hearing, books, writings, and other documents in his possession, power, custody, or control. . ." The notice given by the caveator of its intention to take the deposition of Dr. Russell Thomas and the subpoena duces tecum which the commissioner issued requiring the production of documents were under the quoted Code section. As shown by our statement of the facts, Judge Rees denied the motion of Dr. Thomas to suppress the deposition notice and to quash the subpoena duces tecum but restricted the scope of the examination and limited it to financial transactions between Dr. Thomas and Mrs. Mix during the twelve months immediately prior to her death. This was error. When depositions are taken, the order and scope of the examination must conform to the rules of the superior court governing the examination of witnesses in trials at law. Code § 38-2305; *Realty Construction Co.* v. *Freeman,* 174 Ga. 657 (163 S. E. 732). In

*Parker* v. *Chambers,* 24 *Ga.* 518, it was said in headnote one "a witness may be twice examined by the same party, by commission, in the same case," and in the corresponding division of the opinion at page 524, it was held that "There can be no legal objection to a second examination of a witness by commission, for the purpose of explaining evidence before given, or of testifying to additional facts." As to all issues made by the pleadings in this case, the caveator had a right to examine Dr. Thomas fully and exhaustively. Such a right is basically fundamental to our system of jurisprudence and no court has power to restrict or limit it. See, in this connection, *Park* v. *Zellars,* 139 *Ga.* 585 (1) (77 S. E. 922).

■ Over an objection by caveator's counsel that it was irrelevant, immaterial and prejudicial because the financial condition of Northwestern University had nothing to do with the outcome of this case, Charles Wesley Brashares was, in response to a question asked by counsel for propounder, permitted to testify that the assets of Northwestern University would run into millions, $93,000,000 being not far wrong. Special ground 6 of the motion for new trial assigns error on the admission of this testimony. The general rule is that evidence of the wealth or worldly circumstances of a party litigant is never admissible, except in those cases where position or wealth is necessarily involved. *Higgins* v. *Cherokee Railroad,* 73 *Ga.* 149; *Smith* v. *Satilla Pecan Orchard &c. Co.,* 152 *Ga.* 538 (3) (110 S. E. 303); 10 R. C. L. 957, § 130. We are wholly unable to perceive the relevancy of such testimony to any issue made in this case; it had no tendency to illustrate any contested question, and for that reason was incompetent. A different holding is not required by the ruling in *Oxford* v. *Oxford,* 136 *Ga.* 589 (1) (71 S. E. 883).

■ While Charles F. Crisp, the propounder, was being cross-examined by counsel for the caveator, he was asked the following question: "You were not told anything about her physical condition, as you now recall?" To which he answered: "Well, Dr. Thomas had discussed this matter of changing this codicil, or changing her will, with her, and he told me he was going to try to get her up and feeling well so she could fix it so the corpus of her estate could be left down here instead of going to Northwestern, but later on he told me it looked like Mrs. Mix was not

going to get up and the codicil had better be executed in the hospital." Q. "You did not hear Dr. Thomas and Mrs. Mix discuss this will at all?" A. "Not together." A motion to rule out that part of the witness's answer relating to a conversation between Dr. Thomas and Mrs. Mix respecting a change in her will was overruled. The motion to rule out being based on the ground that the witness was not present, did not hear the conversation between Dr. Thomas and Mrs. Mix and could, therefore, have no personal knowledge of it, should have been sustained; it was error not to do so. This is so elementary that citation of authority is unnecessary.

■ Special ground 8 alleges that the court erred in refusing to allow in evidence a certified copy of Dr. Charles L. Mix's will, together with a certified copy of the appointment of appraisers and the oath of the appraisers of the estate of Dr. Mix; also a certified copy of an application which Mrs. Jeannette C. Mix, as executrix of Dr. Mix's estate, made for three percent of $403,544 for compensation due her as such executrix. These documents were excluded as having no relevancy to any issue made by the pleadings. In this ruling we do not concur. When the excluded documents were offered as evidence, caveator's counsel stated to the court that they were offered for the purpose of showing that Dr. Mix, by his will, left his entire estate of $403,544 to his wife, Mrs. Jeannette C. Mix; that this was the source of the greater part of her estate; and that caveator expected to show that Dr. Mix was a member of the medical faculty of Northwestern University for years. Under the rulings in Pergason v. Etcherson, 91 Ga. 785 (1) (18 S. E. 29); Holland v. Bell, 148 Ga. 277 (1) (96 S. E. 419); Murphy v. Murphy, 152 Ga. 275 (1) (109 S. E. 903); and Shaw v. Fehn, 196 Ga. 661 (2) (27 S. E. 2d 406), testimony showing the source from which the property disposed of by the will came into the decedent's possession was relevant and material in this case; hence, it should have been admitted.

■ Donald B. Caldwell, a witness for the caveator, was, on direct examination, asked: "Please tell us what she [Mrs. Jeannette C. Mix] looked like; just give us her appearance when you first saw her lying there in the bed on your first visit." A. "Well, I was shocked at her appearance to start with. She was very

thin and all skin and bones, pratically, and a very sallow pallor on her face, like a dead person. And, well, except for her facial features, the basic features, I would not have known her." The witness's answer had reference to her appearance on Monday before the codicil in question was executed on Thursday night. On objection by the propounder's counsel the court excluded all of the answer except the words, "She was very thin and all skin and bones, pratically, and a very sallow pallor on her face." Special ground 9 of the motion for new trial complains of this exclusion. The record discloses that the witness was a near relative of Mrs. Mix, she being his aunt. He had known her well all of his life, had visited her about a year and a half before her death, had made visits to her a good many times prior to her last illness, had visited her after she moved to Americus, had visited her in Gainesville, Florida, when her husband was alive, had visited her frequently when he was a boy and also as a young man when she and her husband lived in Chicago. He came from California to Americus to see her on September 21, 1953, after he had learned from Dr. Thomas that she was critically ill. Although he saw her daily from Monday until the following Sunday, she never spoke to him nor recognized him. We think the excluded evidence was clearly admissible; it was a fact which the jury could properly consider in determining the physical and mental condition of the testatrix. In *Bowman* v. *Bowman*, 205 *Ga.* 796 (55 S. E. 2d 298), this court held that an attack on a will as having been obtained by undue influence may be supported by a wide range of testimony since such influence can seldom be shown except by circumstantial evidence and that the amount of influence necessary to dominate a mind impaired by age or disease may be decidedly less than that which is necessary to control a strong mind. In 20 Am. Jur. 719, § 859 it is said: "Lay witnesses have been permitted to testify that a person looked bad, that he looked feeble, that he was lame or could scarcely walk, that he appeared to be very sick and that he was so ill as to be beyond asking anything or in a condition to know anything." This statement was quoted with approval in *Metropolitan Life Ins. Co.* v. *Saul*, 189 *Ga.* 1, 8 (5 S. E. 2d 214).

■ During the examination of J. H. Palmer, a witness for the caveator, he was asked: "Now, do you remember anything else

about how she looked at the times you saw her besides what you have already told us?" A. "She looked like somebody very, very sick." Mr. Palmer's answer was excluded by the court on objection thereto by the propounder's counsel and special ground 12 of the motion for new trial complains of this. Exclusion of this was erroneous. The witness had already testified that he was a cousin of the testatrix's deceased husband; that he had known Mrs. Mix for many years; that his relation to her was like a member of the family; that while in Michigan, he received a message that Mrs. Mix was very sick; that he hurried back to see her, arriving at the hospital on the morning of September 24, 1953; that she was at that time in bed, lying on her back and breathing very slowly and heavily; that he went from Cordele to Americus to see her every day, except one, from September 24, 1953, through October 1, 1953, but never spoke to her, never saw her with her eyes open and was discouraged about trying to wake her up. In Barfield v. South Highlands Infirmary, 191 Ala. 553, 565 (68 So. 30, 35), the court said: "We think any witness of ordinary intelligence may be allowed to testify that a person appeared to be very sick."

■ Special ground 13 of the motion for new trial alleges that the court erred in excluding from evidence the testimony of J. H. Palmer to the effect that he visited the testatrix each day beginning September 24, 1953, and until October 1, 1953, except one, for the purpose of delivering a message to her from her sister in Michigan from whence he had just returned and that each time he visited her, he did not deliver the message as the nurse on duty told him there was no use to arouse her as she would not recognize him. We see no error in the exclusion of this testimony. The message from the testatrix's sister would certainly have no relevancy; and what the nurse on duty told the witness would be hearsay evidence having no probative value.

■ On direct examination by the caveator's attorney, Mrs. Ike Hudson was asked: Q. "Will you describe Mrs. Mix's appearance the times you were in her room after the operation?" A. "Well, each time that I went in the room, she was just lying there with her eyes closed and did not say anything. She looked to me like she was in a coma." On objection the court ruled out the words, "She looked to me like she was in a coma." Special

ground 15 of the motion for new trial assigns error on this ruling. The witness, as the record discloses, had already testified that she was registered with the State of Georgia as a practical nurse; that she was employed by and on duty as such a nurse in the hospital where Mrs. Mix was a patient; that she saw her almost every day after her operation; and that she had known Mrs. Mix at least twelve years. From this opportunity to see and observe the condition of Mrs. Mix, the witness could testify as to the appearance of Mrs. Mix or how she looked to her and the exclusion of that part of her testimony to which there was an objection was erroneous.

■ Mrs. Ike Hudson, a witness for the caveator, on direct examination was asked: Q. "Did you try to have a conversation with Mrs. Mix?" A. "No, sir, she did not look like she could talk and I did not say anything to her." Propounder's counsel: "We move to rule out 'she did not look like she could talk', it is not responsive." The objection was sustained. This was error. Her answer was responsive and she then gave her reason for not speaking to Mrs. Mix as she had a right to do. See *Brown* v. *Wilson*, 55 *Ga. App.* 262 (2) (189 S. E. 860).

■ The parties stipulated that Mr. W. W. Dykes, an attorney, would, if able to attend court, give stated testimony. The concluding paragraph of the stipulation reads: "It is also stipulated and agreed that all of this paper may be used as evidence in the trial of the caveat to the codicil of September 24, 1953, and in any postponement, continuance or retrial of said issue, no matter whether the said W. W. Dykes shall be in good health or even be in life at the time, provided ruled admissible by court." We construe the quoted paragraph to mean that no statement contained in the stipulation would be admitted as evidence on the trial of the cause unless ruled admissible as such by the court under applicable rules of evidence. The caveator offered the stipulation in evidence as a whole. On the ground that it was a conclusion, counsel for the propounder objected to the admission of the following stipulated statement: "That C. F. Crisp knew over the years that W. W. Dykes was Mrs. Mix's attorney." The court sustained the objection and excluded the stipulation as a whole and special ground 16 of the motion complains of this. As to this ruling, we find no error. The statement was a conclu-

sion of Mr. Dykes. "In the future of advancing psychology it may become possible for one person to look into the mind of another and testify what the latter knows. But at present the law treats such statements as conclusions, not facts." *Slaughter* v. *Heath*, 127 *Ga.* 747 (7), 759 (57 S. E. 69, 27 L. R. A. (NS) 1). The stipulated testimony of Mr. Dykes being offered as a whole, and the assignment of error being upon the ruling rejecting the entire stipulation, and since a part of the offered stipulation was clearly inadmissible, it was not erroneous, as contended, to disallow the stipulation in its entirety. *Dorsey* v. *Dorsey*, 189 *Ga.* 662 (4), 671 (7 S. E. 2d 273).

■ Donald B. Caldwell, a witness for the caveator, was, on direct examination, asked: Q. "From your observation of your aunt over your lifetime, and during this visit you had there in this week of her last illness and all of what transpired during that visit, I will ask you to state whether or not, in your opinion, at the time this alleged signature was put on this paper she had sufficient mental capacity to know what property she owned, who her relatives were, and whether or not she could have devised a reasonable plan or scheme to dispose of her property by will?" A. "Well, sir, I saw her a good many times but never in this kind of a condition; and I do not believe she could have told what she owned, or known enough about what she owned to do, at that time, to know what was going on. I believe she would have signed anything that was put in front of her at that moment." On objection thereto the answer was excluded and special ground 18 complains of this ruling. This special ground of the motion is meritorious. The testimony objected to was a part of the following testimony of the witness: He was present when the codicil was signed on the night of September 24, 1953; that he saw and observed the condition of Mrs. Mix, his aunt, at that time; that he heard Dr. Thomas say to her, "if that is what you want you will have to sign the paper, or have to sign the one or the other"; that she was then raised up in bed by Dr. Thomas; that someone took hold of her wrist or arm (indicating); that attorney Russell Thomas put the pen in her hand; that he closed her fingers on the pen; that she then moved her hand on the paper; that she was then, in his opinion, absolutely incapable of understanding what was being said to her. The

record also discloses that several times during the examination of the witness Caldwell, he was permitted to testify, without objection, that he did not believe and was sure Mrs. Mix did not know what she was doing that night. See *Merritt* v. *Wallace*, 173 *Ga.* 435 (160 S. E. 610).

Special grounds 10 and 11 of the motion have been expressly abandoned, and special ground 17 which complains of the court's refusal to allow in evidence a key to Mrs. Mix's safety deposit box which came from the possession of Mr. W. W. Dykes raises a question of so little importance as not to merit consideration.

It is alleged in special ground 4 of the motion for new trial that the court erred in directing a verdict for the propounder. A trial judge can only direct a verdict "Where there is no conflict in the evidence, and that introduced with all reasonable deductions or inferences therefrom, shall demand a particular verdict." Code § 110-104. "It is error to direct a verdict, except where there is no conflict in the evidence introduced as to the material facts, and the evidence introduced together with all reasonable deductions or inferences therefrom demands a particular verdict." *Norris* v. *Coffee*, 206 *Ga.* 759 (58 S. E. 2d 812), and citations. "In any case where the evidence may be subject to more than one construction, or where more than one inference may be drawn, even from undisputed facts, the duty of solving the mystery should be placed upon the jury." *Marshall* v. *Woodbury Banking Co.*, 8 *Ga. App.* 221 (68 S. E. 957). It is true that immaterial conflicts do not render the direction of a verdict erroneous. *Skinner* v. *Braswell*, 126 *Ga.* 761 (2) (55 S. E. 914). If, however, there is a material conflict in the evidence upon a material issue, the trial judge cannot usurp the province of the jury and instruct them to render a given verdict. *Duncan* v. *Mayfield*, 209 *Ga.* 882 (76 S. E. 2d 805). This section ought not to be extended beyond the plain and literal meaning of its words. *Williams* v. *State*, 105 *Ga.* 814, 816 (32 S. E. 129, 70 Am. St. R. 82). A judge cannot properly direct a verdict because he may think the strength or weight of the evidence is on one side, or because he might grant a new trial if a verdict should be returned against what he thinks is the preponderance of the evidence. *Blackburn* v. *Lee*, 137 *Ga.* 265 (73

S. E. 1). Probate of the codicil of September 24, 1953, to the will of Mrs. Mix was objected to on the grounds that the testatrix was mentally incapable of executing it, and that it was executed in consequence of undue influence exercised over her. If either or both grounds be true, the codicil ought not to be probated, or if there is a material conflict in the evidence respecting either or both, it was error for the judge to direct a verdict. "A person has testamentary capacity who understands the nature of a testament or will, viz., that it is a disposition of property to take effect after death, and who is capable of remembering generally the property subject to disposition and the persons related to him by the ties of blood and of affection, and also of conceiving and expressing by words, written or spoken, or by signs, or by both, any intelligible scheme of disposition. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice." *Slaughter* v. *Heath*, supra. "It is well settled that a non-expert witness may give his opinion as to the sanity of another person, based upon his acquaintance with him and the manner, appearance, and conduct of such person during the time that the witness has known him." *Glover* v. *State*, 129 *Ga.* 717 (5) (59 S. E. 816); *Harris* v. *State*, 155 *Ga.* 405 (4) (117 S. E. 460); *Compton* v. *Porterfield*, 155 *Ga.* 480 (117 S. E. 464); *Dyar* v. *Dyar*, 161 *Ga.* 615 (131 S. E. 535). "Undue influence which operates to invalidate a will is such influence as amounts either to deception or to force and coercion, destroying free agency." *Bohler* v. *Hicks*, 120 *Ga.* 800 (5) (48 S. E. 306); *Potts* v. *House*, 6 *Ga.* 324 (50 Am. D. 329); *Thompson* v. *Davitte*, 59 *Ga.* 472 (3). Not all persuasion or influence is "undue." *Ward* v. *Morris*, 153 *Ga.* 421 (3) (112 S. E. 719), and citations. The test is whether the testator was mentally incapable or was unduly influenced at the time the will was signed. *Brown* v. *Kendrick*, 163 *Ga.* 149, 168 (135 S. E. 721); *Fehn* v. *Shaw*, 199 *Ga.* 747 (35 S. E. 2d 253); *Ware* v. *Hill*, 209 *Ga.* 214 (71 S. E. 2d 630). "The very nature of a will requires that it should be freely and voluntarily executed; hence, anything which destroys this freedom of volition invalidates a will; such as fraudulent practices upon the testator's fears, affections, or sympathies, duress or any undue influence, whereby the will of another is substituted for the wishes of the

testator." *Trust Company of Georgia* v. *Ivy,* 178 *Ga.* 629, 641 (173 S. E. 648); Code § 113-208. It was held in *Dean* v. *Littleton,* 161 *Ga.* 651 (131 S. E. 507), that a doctor occupies a confidential relationship with his patient; in *Norman* v. *Hubbard,* 203 *Ga.* 530 (47 S. E. 2d 574), that nurses were in a confidential relationship to the patient; and in *Jesse Parker Williams Hospital* v. *Nisbet,* 191 *Ga.* 821, 840 (14 S. E. 2d 64), that a close business adviser and consultant was in a confidential relationship with his client. In *Bowman* v. *Bowman,* supra, it was said: "Where a will is attacked as having been obtained by undue influence, since such influence can seldom be shown except by circumstantial evidence, the attack may be supported by a wide range of evidence, such as a confidential relationship between the parties; the reasonableness or unreasonableness of the disposition of the testator's estate; diseases affecting the strength of mind of the testator; his dealings and associations with the beneficiary; his habits, motives, feelings; his strength or weakness of character; his family, social and business relations; his mental and physical condition at the time the will was made; his manner and conduct; or any other proved fact or circumstance going to show the exercise of undue influence on the mind and will of the testator. On such an issue there may be taken into account the peculiar facts and circumstances surrounding the issue, and acts, conduct, and circumstances may constitute undue influence when exercised on a person of failing mind, poor health, and other mental and bodily enfeeblements, which would not be such undue influence as to affect a will executed by a person of sound mind, good health, and intelligence."

In this case, certain undisputed facts appear in the record. When the codicil under attack was executed, the testatrix was 87 or 88 years old. She had cancer and had undergone an operation on August 27, 1953. After her operation, two nurses were kept on duty with her at all times until her death on October 2, 1953. Dr. Russell Thomas had been her personal physician, close business adviser and consultant for about five years before the codicil was made on September 24, 1953. She had been in Americus-Sumter County Hospital since January, 1953. Dr. Thomas advised Donald Caldwell, her nephew, that she was critically ill, and if he wanted to see her alive he had better come

at once. Caldwell came from California, arriving in Americus on September 21, 1953. He went to the hospital with Dr. Thomas, but Mrs. Mix did not recognize him or speak to him. He saw her daily during that week and she never spoke to or recognized him on any visit nor did he hear her speak to anyone else. On September 23, Donald Caldwell, Dr. Thomas and two attending nurses witnessed a scrawl which Mrs. Mix put on a check for $22,104.04. Donald Caldwell and Dr. Thomas went to the Bank of Commerce on the morning of September 24, 1953, and talked with Charles F. Crisp about the estate of Mrs. Mix. During this conversation, Mr. Crisp was slow to answer, talked indefinitely and kept looking at Donald Caldwell until Dr. Thomas said, "Oh, don't mind Donald, he is on our side." During the same conversation, Dr. Thomas, speaking to Mr. Crisp, said: "How do you think she would react to you, me and Donald doing what she wanted done and doing it in Sumter County where we will know that it is done, and I believe that is what she wants done and I believe she will appreciate the opportunity to have it done that way." During the same morning and after Mr. Crisp failed to get a copy of Mrs. Mix's will elsewhere, he opened her safety deposit box and copied from her original will the item respecting a bequest to Northwestern University, as trustee. Dr. Thomas employed his nephew, attorney Russell Thomas, to prepare a codicil to the original will of Mrs. Mix, furnishing him the information obtained by Mr. Crisp and instructing him as to the contents of the codicil he was to prepare. During the afternoon of the same day, attorney Thomas, as he testified, "called on her [Mrs. Mix] to make certain that she was capable of executing her last will and testament." On this visit he was accompanied by Dr. Thomas, but neither of them informed Mrs. Mix that he had been retained to prepare a codicil to her will; there was no discussion of the codicil while they were with Mrs. Mix. The codicil was executed during the night of September 24, 1953, between 10 and 11 o'clock. The codicil was delivered to Mr. Crisp the following morning by Dr. Thomas, and the former attached it to her original will. Mrs. Mix, on December 3, 1952, drew a check on her bank account payable to Dr. Russell Thomas for the sum of $15,000 with a notation thereon: "For loan." On June 17, 1953, she drew another check

on the same bank payable to Dr. Russell Thomas for the sum of $15,000 with a notation thereon: "For loan, no Int." These checks were endorsed by Dr. Thomas and paid by the bank. An inventory which Mr. Crisp, the executor, filed in November, 1953, did not show these loans as assets of the estate of Mrs. Mix. These transactions first came to light when an audit of Mrs. Mix's estate was being made for income-tax purposes during March, 1954. Dr. Thomas had given Mrs. Mix no note or other evidence of indebtedness for the loans. He had not disclosed the fact that he owed the estate of Mrs. Mix $30,000. He admitted the indebtedness when Mr. Crisp mentioned it to him. No part of the loans has been repaid by Dr. Thomas. On August 17, 1953, Mrs. Mix's signature was bold, clear, and entirely legible; on September 10 and 17, 1953, it was barely legible; and on September 23 and 24, 1953, it was wholly illegible, being only a scrawl or scratch. From August 27, 1953, until 10:45 p.m. on September 24, 1953, Mrs. Mix received 100 shots of potent narcotics and 74 barbiturates. She received 5 of these narcotics and 4 barbiturates on September 24, 1953. The last shot of Dolophine with Dramamine, being twice the amount given her at 1:10 p.m., came at 7:15, about three hours before the codicil was brought to her room. Mrs. Mix had had no food or other nourishment except glucose for the four days preceding the night the codicil was executed. The quantity of glucose which she received was equal to from one-third to one-fourth the normal requirement for a bedridden person her age. An entry made on Mrs. Mix's bedside chart on September 24, 1953, at 10:30 p.m. shows: "Pulse weak, Resp. labored, Cond. poor." And one made on the same day at 10:45 p.m. shows: "Dr. Thomas here." Mrs. Mix did not have a high regard for the business ability of Donald B. Caldwell, her nephew; she thought he did not handle money too well. Dr. Thomas did not testify on this trial of the case.

The three witnesses to the codicil testified to the formalities of execution as required by law, to the testamentary capacity of Mrs. Mix at the time of the execution of the codicil and further that she acted freely and voluntarily in making it. The propounder also introduced other evidence.

Donald B. Caldwell, a witness for the caveator, testified: "As far as I know this paper was first presented to my aunt that same

Thursday night some time between ten and eleven; she was in her bed then in the hospital; when we got to the room, Dr. Thomas went in first and then the lawyer and I brought up the rear; this was some time between ten and eleven on Thursday night, September 24, and by the time I got in the room I met the nurses coming out and then I went on in and Dr. Thomas walked up to the bed as usual; the lawyer stood at the foot of the bed and, as I remember, I went on around and Dr. Thomas started to talk to my Aunt Jeannette; Dr. Thomas said to her something like this: 'Madam, you know we have talked a good deal about my taking care of matters for you in connection with the estate; is that what you want?', and she seemed to nod her head up and down a little, and then he went on and he said about like this: 'Well, Charles Crisp and Donald and I have been talking things over about how best to handle things, matters for you, and so I had a paper prepared calling for Charles and Donald and I to be your trustees to handle everything just the way you want it; if that is what you want, you will have to sign it'; that is just what he said; she did not say anything; the lawyer never said anything at all all the time he was there except when the doctor told him to bring the things up to the bed; he was so slow getting it up there Dr. Thomas was hurrying him up; well, first off he raised her up in bed; all the time that Dr. Thomas was talking to her along the line I outlined a moment ago she was in bed, her head back on the pillow as always, just the same as I had seen her before that time; when Dr. Thomas said, 'if that is what you want, you will have to sign the paper, or have to sign the one or the other', she kind of held up her hand like this (indicating) and they raised her up; she still was not straight up, kind of leaning back like that; while he held her, she raised her hand like that (indicating) and someone took her wrist, her arm in here somewhere (indicating); the lawyer came and put the pen in her hand; I remember very well closing the fingers on her pen and then he wanted a book or something like that and she moved her hand on it as I saw it happen." Later this witness was asked: Q. "Now, what was your aunt's mental condition during the time you were in that room this evening, September 24, 1953, and at the time this scrawling was put on that paper, as claimed to be her signature? What was her mental

condition?" A. "I didn't think she knew what was going on." Q. "Did she, in your opinion, was she capable of understanding what was being said to her?" A. "Absolutely not. At no time in there was the word will or codicil used in her presence by anyone; the document was never read to her by anyone before she put this scrawl on there in the manner I have described; I cannot recall a single time while I was down there on that visit that Mrs. Mix acted like she knew me; she never showed any sign that she recognized me at any time." Dr. Arthur P. Richardson, a witness for the caveator, testified: "When a person is going under the influence of a narcotic or barbiturate, the first function most apt to be modified would be the emotional function and very closely related to this would be the capacity to carry out rational reasoning; this would all disappear before anyone would lose motor function such as signing your name and walking comfortably and so on; consciousness would be the last one to go; the first one to go would be emotional stability; secondly, the capacity to reason; at a somewhat later date motor function such as writing your name and consciousness would go last; a person who has lost his capacity to control emotional reaction and also his capacity to reason could still retain the motor faculty of writing his name; I don't believe the reverse would be the case; an individual who could not write his name, I think, would have already lost his ability to reason and also to control in a normal fashion his emotions . . . the signature on the check of September 23 indicates to me that in the absence of any evidence of physical damage, such as a broken arm or damage to the peripheral nerves, this would represent very serious mental deterioration; . . . I see no resemblance between the signature or scrawl on the codicil in contest and her original signature; that would indicate to me that there had been serious impairment of her mental capacity at this time." Dr. Reeves Chalmers, a witness for caveator, testified: "If you have a patient who is going under the influence of a narcotic or barbiturate, the capacity to reason and control emotions would be the first capacities lost; the loss of capacity to write, to use the muscles, is a very late accompaniment of the effects of narcotics; in other words, the narcotic affects the capacity to reason much more rapidly than they affect the capacity to use the muscles and, of

course, consciousness is usually lost last." Mrs. George McGarrah, a witness for caveator, testified that Mrs. Clarence Ames, one of the witnesses to the codicil in question, made the following statement to her on Saturday after the codicil was executed on Thursday night, "I probably got myself in trouble the other night . . . I signed as a witness to Mrs. Mix's will, . . . but I don't think she knew what she was doing—she was more or less in a coma and Dr. Thomas had to hold her hand for her to sign the paper." Mrs. Ike Hudson, a witness for caveator, testified that Mrs. Clarence Ames, a few days after the codicil was executed, made the following statement to her: "They wanted me to be a witness to the will, the document they were fixing, and I hestitated in signing it because I did not want to sign anything I know nothing about and Dr. Thomas told me, 'Honey, go ahead and sign it, it is nothing only Mrs. Mix started making a will and got where she could not finish it and we are finishing it for her.' . . Dr. Thomas told Russell Thomas to put the pen in Mrs. Mix's hand and he, Russell Thomas, would tell her how to write her name. . . Dr. Thomas would kind of shake Mrs. Mix once in a while to keep her roused up for Mrs. Mix to sign the paper."

Standing alone, the admission of a prima facie case by the caveator, or the evidence introduced on the trial by the propounder, would have required the verdict directed by the court. But from the great mass of evidence in the record, we have pointed out facts and circumstances which would have authorized the jury to find that the codicil under attack was not the free and voluntary act of Mrs. Mix, but that Dr. Russell Thomas substituted his will for the wishes of Mrs. Mix when she did not, under the law, have testamentary capacity. A comparison of the bold, clear signature on the original will of October 27, 1939, with the misplaced, illegible scrawl or scratch on the purported codicil of September 24, 1953, strongly indicates a complete physical and mental collapse of the testatrix. On the issues raised by the pleadings, there was a material conflict in the evidence rendering it reversible error to direct a verdict in favor of the propounder. "No principle is more firmly established in American jurisprudence than that the court cannot direct a verdict where there is any reasonable inference supported by evidence

which would authorize a verdict to the contrary." *Taylor* v. *Chattooga County*, 180 *Ga.* 90 (178 S. E. 298).

*Judgment reversed. All the Justices concur.*