A89A1339. TIMBERBANK, INC. et al. v. HAYNES.
(386 SE2d 861)

Banke, Presiding Judge.

Winfred N. Haynes sued TimberBank, Inc., his former employer, for breach of their written employment agreement. By separate complaint, he also sued Michael W. Caton, TimberBank's principal officer and shareholder, seeking both to hold him personally liable on the contract on the theory that he had operated the corporation as his alter ego and to hold him liable in tort for malicious interference with his rights under the contract. TimberBank counterclaimed, alleging breach of contract and breach of fiduciary duty by Haynes. The two cases were consolidated for trial.

Based on the evidence presented during the trial of the case, the court determined that Caton could not be held personally liable for the corporation's acts under the alter ego theory and accordingly directed a verdict in his favor on that claim. The jury thereafter returned a verdict in favor of Haynes on the remaining claims, assessing $5,000 in damages against TimberBank for breach of contract and assessing $60,000 in actual damages plus $5,000 in punitive damages against Caton for tortious interference. The jury additionally determined that the defendants were liable to Haynes for attorney fees; and, pursuant to a stipulation by the parties that the amount of such fees would be left to the court, attorney fees were subsequently assessed against them jointly in the amount of $60,000. This appeal is from the denial of the defendants' motions for new trial or for judgment notwithstanding the verdict.

TimberBank was formed in 1985 for the purpose of marketing investment opportunities in timberland to institutional investors. The company did not itself own such properties but sought to earn fees from investors for managing properties thus marketed. Caton was TimberBank's president and chief executive officer, as well as the owner of 98 percent of its voting stock. The company had two initial sources of income. The first was a contract to manage certain Mississippi timber leases owned by McMahan & Company, a company for which Caton had formerly worked and which was owned in whole or in part by his stepbrother, Bruce McMahan. The management fees

generated by this contract amounted to $275,000 per year. TimberBank's second initial income source was the registered investment advisor through which it planned to market its services. That company had agreed to pay TimberBank $12,000 to $15,000 per month during the initial period of its existence to help sustain it until it could begin generating sufficient revenue from the sale of its management services to cover all of its expenses.

Early in 1985, Caton offered Haynes, then a professor at the University of Georgia's School of Forest Resources, a position with TimberBank in hopes that the latter's contacts and technical expertise in the timber industry would help the company attract clients. Negotiations between the two men culminated in the execution of the written employment contract which is the subject of this action. Pursuant to the contract, Haynes was to begin work on July 1, 1985, as TimberBank's Chairman of the Board and Chief Operating Officer, at an annual salary of $65,000. His duties were to include supervising and negotiating purchases and sales of "timber, timber leases and other property" and "such other responsibilities and duties consistent with his executive position and of such a nature as are usually associated with the office of Chairman of the Board and Chief Operating Officer of a substantial corporation as may be assigned to him from time to time by the Board of Directors of TimberBank." The contract specified that Haynes would receive six months' salary as severance pay in the event his employment were terminated "for cause," 12 months' salary in the event his employment were terminated "without cause," and no severance pay in the event he resigned voluntarily.

At about the time Haynes commenced his employment with TimberBank, it became apparent that, due to the failure of certain anticipated revenue to materialize, the company would not have sufficient income initially to cover all of its projected operating expenses. Accordingly, Haynes agreed in writing to reduce his time commitment to 11 days per month and to accept a proportionate decrease in compensation from September 1, 1985, through December 31, 1985. Because TimberBank's financial situation had not improved by January 1, 1986, this arrangement was later extended orally through June 30, 1986.

In the spring of 1986, Haynes notified TimberBank that he would not be willing to continue his employment on a reduced salary basis past June 30, 1986. In a telephone conversation which occurred on that date, Caton told Haynes that the timberland investment program would have to be terminated because of their lack of success in securing commitments from institutional investors. Haynes testified that when he asked about his severance pay, Caton told him there was no money available to pay it and that if he insisted upon receiving it, he would be assigned to Hazelhurst, Mississippi, to assume

field responsibility for the management of the Mississippi timber leases. Haynes stated that he responded by informing Caton that he did not intend either to move to Mississippi or to abandon his claim for severance pay.

Acting in his capacity as president of the company, Caton sent Haynes a letter on July 7, 1986, informing him that TimberBank would not continue to pay him for his services unless he assumed the duties of the company's forester in Hazelhurst, Mississippi. On July 28, 1986, Caton sent another letter to Haynes informing him that, by unanimous resolution of the Board of Directors, his employment with TimberBank had been terminated due to his failure to perform his assigned duties. This letter ended by stating: "The foregoing is without prejudice to the company's claim that the agreement has been terminated by you prior hereto."

In September of 1986, McMahan & Company gave notice to TimberBank, as it was evidently authorized to do under their contract, that its management services in connection with the Mississippi timber leases would no longer be required after December 31, 1986. Because TimberBank was by then no longer receiving any income from the registered investment advisor, this meant that as of December 31, 1986, TimberBank had no source of revenue whatever. The company ceased all business operations as of that date; and on January 1, 1987, responsibility for the management of the Mississippi leases was assumed by Caton & Company, a formerly inactive corporation owned by Caton's wife. Caton thereafter received a salary of approximately $120,000 per year from that company. *Held*:

1. The trial court did not err in denying TimberBank's motion for a directed verdict on the breach of contract claim. The jury was authorized to conclude from the evidence that the position in Hazelhurst, Mississippi, to which the company purportedly wished to assign Haynes did not involve duties "of such a nature as are usually associated with the offices of Chairman of the Board and Chief Operating Officer of a substantial corporation," with the result that the purported assignment was inconsistent with the terms of the employment contract. Indeed, the jury could reasonably have concluded under the circumstance that the assignment was nothing more than a thinly disguised ruse designed to enable the company to adopt the position that Haynes had relinquished his right to severance pay by resigning voluntarily.

2. Nor did the trial court err in denying Caton's motion for directed verdict on the tortious interference claim. The evidence established that, as the company's chief executive officer and owner of 98 percent of its voting stock, Caton was in complete control of TimberBank; that he was paid a salary by the company of at least $120,000 per year until it ceased operations; that by the second half of

1986 the only source of revenue available to the company from which to pay this salary was its timber management contract with McMahan & Company, which was owned wholly or in part by his stepbrother; that a shell corporation owned by Caton's wife was substituted for TimberBank as the financial beneficiary of this contract within six months after the termination of Haynes' employment; and that Caton thereafter continued to receive an annual salary of $120,000 as an employee of that corporation. The jury could reasonably have determined from these facts that, in attempting to defeat Haynes' claim for severance pay, Caton was not merely discharging his duties as an officer and agent of the corporation, which was already insolvent and which ceased doing business altogether within six months after Haynes' termination, but was using his control of the corporation to promote his own personal financial interests at Haynes' expense. Under such circumstances, he could be held liable for tortious interference with Haynes' rights under the employment contract. "One who is sued in his personal capacity, whether the alter ego, an officer or agent of a corporation, may not escape personal liability for his tortious misconduct damaging employees or third persons by hiding behind the corporate veil even in those situations where the corporation might also be a proper party to the action." See *Wrigley v. Nottingham*, 111 Ga. App. 404 (141 SE2d 859) (1965), rev'd, in part, on other grounds. *Nottingham v. Wrigley*, 221 Ga. 386 (144 SE2d 749) (1965). Such cases as *Lane v. K-Mart Corp.*, 190 Ga. App. 113 (2) (378 SE2d 136) (1989), *Henson v. American Family Corp.*, 171 Ga. App. 724 (4) (321 SE2d 205) (1984); and *Sacks v. McCrory*, 160 Ga. App. 430 (287 SE2d 292) (1981), do not constitute authority for a contrary result, as there were no circumstances in those cases which suggested that the individual corporate officials named as defendants had utilized their corporate authority to further their own personal financial interests at the expense of a valid contractual claim asserted by the plaintiff.

3. The appellants assert that the trial court erred by excluding evidence that Haynes had adequate independent financial resources to support himself, arguing that such evidence would have advanced their position that Haynes had resigned voluntarily by establishing that he was in a financial position to survive without receiving any severance pay. This enumeration of error is patently without merit. Haynes made no suggestion to the jury that he was impecunious, and his need or lack thereof for the severance pay had nothing to do with his contractual entitlement to it. See generally *Northwestern Univ. v. Crisp*, 211 Ga. 636, 641 (2) (88 SE2d 26) (1955).

4. The appellants contend that the trial court erred in refusing to exclude evidence that Caton and his wife had fabricated certain "memoranda to file" purporting to memorialize various events and

conversations leading up to Haynes' departure. The appellants did not seek to exclude the content of these memoranda from evidence but only to exclude testimony tending to show that they had been prepared at a time subsequent to the events which they purported to memorialize. The appellants assert that the admission of this testimony violated the rule that a witness may not be impeached by evidence concerning collateral matters which are irrelevant to the issues being tried. See *E. H. Siler Realty &c. v. Sanderlin*, 158 Ga. App. 796, 798 (282 SE2d 381) (1981). Inasmuch as the content of the memos was before the jury and was relevant to the issues being tried, we find this enumeration of error to be without merit.

5. The appellants contend that the trial court erred in refusing to allow Caton's former secretary to be questioned regarding the substance of certain complaints she had heard Caton and another TimberBank official make regarding Haynes' performance. While this witness was allowed to testify that she had overheard such complaints, she was not allowed to go into the details of their substance. We find no error. The secretary's recollection of the content of these complaints clearly was not relevant to explain any aspect of her own conduct which was legitimately at issue in the case. See generally OCGA § 24-3-2. Moreover, both Caton and the other TimberBank official whom the witness had overheard making the complaints were available to testify regarding their substance, and there was no attack on their testimony in this regard which would have rendered the secretary's recollection of the details of their conversations admissible either to bolster their testimony or to impeach the testimony of any other witness. Compare *Edwards v. State*, 255 Ga. 149, 151 (335 SE2d 869) (1985).

*Judgment affirmed. Sognier and Pope, JJ., concur.*

DECIDED SEPTEMBER 6, 1989 —
REHEARING DENIED SEPTEMBER 25, 1989 —

*Alston & Bird, G. Conley Ingram, Robert D. McCallum, Jr., Susan B. Devitt*, for appellants.

*Sutherland, Asbill & Brennan, Kimberly L. Woodland, John H. Fleming, Jr., Rogers & Hardin, John J. Almond*, for appellee.