## A09A1001. HARPER v. BARGE AIR CONDITIONING, INC.
(686 SE2d 668)

BARNES, Judge.

Jocelyn Harper contends she suffered brain damage after being exposed to high levels of carbon monoxide at her former place of employment, AutoZone. She sued Barge Air Conditioning, Inc., whose technician had serviced one of the store's two heating, ventilating, and air conditioning (HVAC) units earlier in the day. At trial Harper presented circumstantial evidence and expert testimony that the elevated carbon monoxide levels were caused by the negligence of Barge's technician, but the trial court granted Barge's motion for a directed verdict on liability. Harper appeals that grant, as well as the trial court's earlier grant of a directed verdict on the

issue of lost wages. For the reasons that follow, we reverse the directed verdict to Barge and remand for further proceedings.

1. This court reviews de novo the trial court's ruling on a motion for directed verdict, which should not be granted if "there is any reasonable inference supported by evidence which would authorize a verdict to the contrary." *Northwestern Univ. v. Crisp*, 211 Ga. 636, 654-655 (88 SE2d 26) (1955). Evidence strongly supporting but not demanding a particular finding does not warrant a directed verdict. *Speir v. Williams*, 146 Ga. App. 880 (247 SE2d 549) (1978). We must scrutinize a trial court's decision to grant a directed verdict with great care, because "it is in effect a determination that a party is not entitled to his or her right to a trial by jury even after a demand for jury trial has been made." *Svc. Merchandise v. Jackson*, 221 Ga. App. 897, 899 (1) (473 SE2d 209) (1996).

In this case, the evidence showed that Harper was poisoned by carbon monoxide gas at work, and that the only possible sources of the carbon monoxide were the gas furnaces or a propane-fueled floor buffer that was used shortly before she became ill. OSHA testing established that the floor buffer emitted no carbon monoxide, leaving only the two HVAC units as possible sources. A Barge technician serviced one of the units the day Harper and her two co-employees became ill, and Harper's expert testified that the only thing that could have caused the unit to emit carbon monoxide into the store was the technician's improper replacement of the access panel he had removed to service the unit. Barge's owner inspected the unit by himself the day after the employee became ill. This evidence created genuine issues of material fact that a jury should decide.

Harper managed a 7,500-square foot AutoZone store that was heated and cooled with two HVAC units suspended from the ceiling. In May 2005, the store's air conditioning was not working properly, and someone from Barge worked on the units several times. On May 25, 2005, a Barge technician came to the store at 8:30 a.m. on a "no cool call" and serviced the unit closest to the street. He climbed a ladder, removed an access panel to the closed system, realigned the blower pulley and motor pulley in the air handler, replaced a broken belt, and replaced the access panel. After he left, the store "got hotter and hotter." When the HVAC fan started up, the air had a "strong odor" like something was burning. The store closed at 9:00 p.m., but Harper and two other employees, Wanda Barthel and Velvet Layfield, continued working to prepare for a meeting the next day.

A janitorial service employee came in and cleaned the floor, using a propane-powered buffer for 45 minutes to an hour. An hour or so after he left, Barthel began to feel sick with a headache and heavy

limbs. She told Layfield she felt ill and as she headed toward the back of the store to tell Harper, she threw up. Harper tried to help Barthel into the bathroom but Barthel passed out and Layfield called 911. Emergency medical technicians took Barthel to the hospital, leaving Harper and Layfield in the store. The two women felt dizzy and shaky. Layfield realized that their symptoms were consistent with carbon monoxide poisoning, and they went to the hospital to tell the personnel treating Barthel about their concerns.

After confirming that Barthel had carbon monoxide poisoning, hospital personnel retrieved Harper and Layfield from the waiting room, tested their blood, and admitted them to the hospital for treatment of carbon monoxide poisoning. Harper's carbon monoxide level was 24.3, which was "alarmingly high," according to a physician with expertise in the effects of carbon monoxide poisoning. Harper was airlifted to Crawford Long and spent three days in a hyperbaric chamber to force the carbon monoxide out of her system. She suffers from significant cognitive and emotional deficits and was not working as of the trial in August 2008.

Harper called an AutoZone assistant manager from the hospital, and he called the fire department around 3:00 a.m. on May 26, 2005, to come check on the air in the store. Firemen put a fan in the open front door and opened the back door, and five to thirty minutes later testing revealed the presence of carbon monoxide. The firemen stayed until the carbon monoxide dropped below the level of detection, and left between 5:00 and 6:00 a.m., recommending that the assistant manager contact the gas department for a "second opinion" before opening the store. The fire captain testified that the only source of combustion he detected while he was there were the gas heaters in the two HVAC units suspended from the ceiling.

The superintendent for the Cordele natural gas department responded to a "gas situation" call later that morning on May 26, 2005. His report indicated that there was a "strong odor" inside the store. The supervisor found no gas leaks, but testing revealed 46 parts per million of carbon monoxide inside the store, and the only possible source for the carbon monoxide was the two gas heaters. He vented the store for more than an hour until he could detect no carbon monoxide, and the gas department subsequently received no more calls from the store.

A former employee for TriState Janitorial Services testified that he had cleaned the floors at AutoZone on the evening Harper became ill. He used the same buffing machine he always used, which he ran for 45 minutes to an hour. The machine was a 28-inch buffer powered by a 13-horsepower propane-fueled engine with a sensor on it that changed color if carbon monoxide levels rose too high. The color did not change on the sensor tag while the employee used it at AutoZone,

and he did not feel ill afterward. When TriState's owner learned on May 26, 2005 that three AutoZone employees had become ill from carbon monoxide poisoning the night before, he removed the buffer from service. OSHA examined the buffer, after which the owner was allowed to place it back into service. His employees and customers had never complained of feeling ill after the buffer was used, and none of the sensor tags on his machines had ever changed color, although he admitted he had allowed the tags to remain in use for as long as three months despite the manufacturer's recommendation that they be changed every thirty days.[1]

John Barge, the owner of Barge Air Conditioning, came to the store the morning of May 26, 2005, at the assistant manager's request. He testified that he visually inspected the burners, the heat exchangers, and the flue where any carbon monoxide should vent out, and did not see anything wrong. He testified that he met the gas department supervisor at the store and visually inspected the furnaces again, finding no problems. The owner returned to the store that afternoon with a service technician and testified that this was the first time anyone physically examined the unit, again finding no problems. He admitted that the only sources of carbon monoxide in the store were the two HVAC units and the floor buffer.

Timothy Dunn, a chemical engineer who had investigated the cause and origin of 60 to 75 carbon monoxide cases, testified that combustion normally produces carbon dioxide and water as waste products but incomplete combustion results in carbon monoxide. In a furnace the carbon monoxide is vented outside through the flue or chimney. Carbon monoxide is a gas and has almost the same molecular weight as air, which is mostly oxygen and nitrogen, and when emitted does not stratify but disperses throughout the room. It is cleared from a room by diluting the tainted air with fresh air and once cleared the air should remain clear unless it is replaced with more carbon monoxide. After reviewing the investigative reports, OSHA report, photographs of the HVAC units, and a dozen depositions, inspecting the store, and testing the units, Dunn concluded that Harper's carbon monoxide poisoning was caused by a malfunction of the HVAC unit that Barge's technician serviced. The only two sources of combustion had been the buffer and the gas burners in the HVAC units. Dunn eliminated the buffer as the source of the gas because the buffer operator had never become ill and OSHA tests uncovered no carbon monoxide emissions from the machine, leaving the HVAC system as the only source of the carbon monoxide.

---

[1] TriState was initially a defendant, but settled with Harper before trial and apparently was dismissed from the case.

Furthermore, the fire department cleared the building of carbon monoxide on the morning of May 26, but six hours later the gas department found more carbon monoxide. Therefore, something produced carbon monoxide in the interim, and the only source of combustion was the gas burner in the front HVAC system where the pilot light was on. Because no one had become ill before or after that day, Dunn concluded that the HVAC system must have changed in some way to cause the carbon monoxide buildup. Dunn exhaustively reviewed how the system worked, and noted that the Barge technician removed the access panel earlier in the day to service the air conditioner. If he replaced the panel improperly, then any gap would allow carbon monoxide from the gas burner to be drawn into the air handler and distributed throughout the building. Although the technician testified he replaced the panel and the owner testified the panel was in place when he inspected it, the expert testified that no other scenario explained how Harper became poisoned with carbon monoxide. No customers became ill because the extent of poisoning depends on the length of exposure time and level of concentration — they did not remain in the store for long and the opened doors diluted the gas, while Harper was in the store for many hours after the doors were closed.

Whether to direct a verdict on liability is a fact-based determination. Harper contends that she introduced sufficient circumstantial evidence of Barge's negligence for the issue to go to the jury. Harper's expert, who survived Barge's *Daubert* motion, testified that the only explanation for the elevated carbon monoxide levels in the store was that the air conditioning technician failed to secure the access panel, despite testimony that the panel was in place and the owner's testimony that it was impossible for the furnace to have malfunctioned as the expert described. In granting Barge's motion for a directed verdict, the trial court held that the plaintiff presented "no competent evidence that the defendant's employee committed any negligent act. [The technician] testified that he securely replaced the access panel in question."

In response Barge argues the merits of its *Daubert* motion, but the record does not include a transcript of the *Daubert* hearing or the trial court's denial of the motion. Further, Barge did not file a cross-appeal contesting the trial court's ruling denying its *Daubert* motion. See *Chester v. Ga. Mut. Ins. Co.*, 165 Ga. App. 783 (1) (302 SE2d 594) (1983) (cross-appeal required for appellees to challenge rulings adverse to them). Our Supreme Court has also held, however, that "a ruling that becomes material to an enumeration of error urged by an appellant may be considered by the appellate court without the necessity of a cross-appeal. [Cits.]" *Ga. Society of Plastic Surgeons v. Anderson*, 257 Ga. 710, 711 (1) (363 SE2d 140) (1987).

In this case, however, pretermitting whether this court could consider the trial court's *Daubert* ruling without a cross-appeal, "[a]bsent a record of the arguments made, the facts presented in support, and the basis for the trial court's ruling, we must assume that the evidence supported the ruling." *McMillian v. Rogers*, 223 Ga. App. 699, 701 (1) (a) (479 SE2d 7) (1996). Accordingly, we cannot find that the trial court in this case abused its discretion in allowing Dunn to testify as an expert about the cause and origin of the carbon monoxide that poisoned Harper. Further, Barge did not object during trial to Dunn's testimony on the ground that he was unqualified to give his opinion in this matter. Thus Barge "waived all remaining objections to the expert testimony by failing to object contemporaneously." *Airasian v. Shaak*, 289 Ga. App. 540, 543 (2) (657 SE2d 600) (2008). Consequently, the record contains evidence, albeit circumstantial, that Barge was negligent and responsible for Harper's injuries.

"Some circumstantial evidence is very strong, as when you find a trout in the milk,"[2] Henry David Thoreau's allusion to the practice of some dairymen of watering down milk, a huge problem in New York City in the 1850s.[3] If you find a fish in your milk, it is reasonable to conclude the dairyman added water to it, for how else would a fish get there? Here, if you find carbon monoxide gas in your store after the technician services your air conditioner, all sources of emission save the HVAC system are eliminated, and the problem never returns after the same company examines your system again, it is reasonable to conclude that the technician caused the carbon monoxide emission.

> In considering whether a verdict should be directed, the plaintiff is not required, even when relying only on circumstantial evidence, to establish his contentions to the exclusion of every other reasonable hypothesis. When the evidence is subject to more than one construction at the time the motion for directed verdict is made, it does not demand a verdict for either party. A court cannot direct a verdict where there is any reasonable inference supported by evidence which would authorize a verdict to the contrary.

(Citations and punctuation omitted.) *Westin Hotels v. Natkin Svc. Co.*, 192 Ga. App. 493, 495 (1) (385 SE2d 141) (1989).

Further, the facts in this case would support a theory of res ipsa

---

[2] Henry David Thoreau, The Writings of Henry David Thoreau (Walden edition, Journal II 1850–September 18, 1851) (Bradford Torrey ed., Houghton Mifflin & Co. 1906).

[3] Bee Wilson, *The Swill Is Gone*, N.Y. Times, Sept. 28, 2008.

loquitur, which "is simply a rule of circumstantial evidence that allows an inference of negligence to arise from the happening of an event if the [proper] elements are shown." *Persinger v. Step by Step Infant Dev. Center*, 253 Ga. App. 768, 770 (560 SE2d 333) (2002). Those elements are: (1) the injury ordinarily would not occur in the absence of negligence; (2) the injury was caused by an agent or instrument within the defendant's exclusive control; and (3) the injury was not due to any voluntary action or contribution on the plaintiff's part. *Kmart Corp. v. Larsen*, 240 Ga. App. 351, 352 (522 SE2d 763) (1999) (affirming plaintiff's verdict after trial court charged on res ipsa loquitur). If the cause of the accident is fully explained, then the doctrine does not apply, but if "the true cause is still left in doubt or is not clearly shown, the doctrine of res ipsa loquitur remains in the case, leaving to the jury a permissible inference of negligence for them to accept or reject." (Citations and punctuation omitted.) *Doyle v. RST Constr. Specialty*, 286 Ga. App. 53, 58 (648 SE2d 664) (2007). In this case, because the evidence supports a reasonable inference that would authorize a verdict for Harper, the trial court erred in directing a verdict to Barge.

2. Given that this case must be retried, Harper's contention that the trial court erred in directing a verdict against her on her claim for lost wages is moot.

*Judgment reversed and case remanded for further proceedings. Miller, C. J., concurs. Andrews, P. J., concurs in the judgment only.*

DECIDED NOVEMBER 13, 2009.

*Bell & Mulholland, Lloyd N. Bell, Robert E. Mulholland*, for appellant.
*Crim & Bassler, Harry W. Bassler*, for appellee.