44669. THE GEORGIA SOCIETY OF PLASTIC SURGEONS, INC. et al. v. ANDERSON et al.
(363 SE2d 140)

PER CURIAM.

This case involves an article published in the February 1982 edition of The Journal of the Medical Association of Georgia ("MAG Journal") which was entitled "Things Are Never What They Seem, Skim Milk Masquerades as Cream" (the "Skim Milk" article).[1] Asserting that the article was highly critical of their qualifications, the appellees, who are Dr. Jack R. Anderson, the American Academy of Facial Plastic and Reconstruction Surgery, and the American Association of Cosmetic Surgeons, filed suit against the appellants, Dr. William E. Huger, Dr. John A. Rusca, and the Georgia Society of Plastic Surgeons, Inc. The plaintiffs alleged that the three defendants and others had conspired in the preparation and publication of the Skim Milk article, and based their complaint, as amended, on theories of libel, unfair trade practices (specifically, false disparaging statements about their services or business), and intentional infliction of emotional distress.

At the close of the evidence, the court denied the defendants' motion for a directed verdict as to the claims for libel and unfair trade practices, and granted their motion for a directed verdict regarding the claim for intentional infliction of emotional distress. The court then charged the jury on theories of libel and common-law dis-

---

[1] There is one error in the article which is not in issue, but which, as fans of Gilbert and Sullivan, we nevertheless wish to correct. The error is found in the first footnote to the article, wherein the authors attribute the title of their article to Gilbert and Sullivan's *Mikado*. The quotation, however, is actually from *H.M.S. Pinafore*.

paragement of services. The jury, finding for the plaintiffs, awarded Dr. Anderson $500,000 in actual damages and $1 million in punitive damages on the libel count (these were the only punitive damages awarded) and $1,000 damages on the unfair trade practices claim. Each of the plaintiff medical groups was awarded $1,000 on the libel claim and $1,000 on the unfair trade practices claim. In addition, the jury awarded attorney fees of $140,000 as damages for the unfair trade practices and also as expenses of litigation under OCGA § 13-6-11. The court subsequently granted an injunction under the authority of the Uniform Deceptive Trade Practices Act to prevent the defendants from disparaging the services or businesses of plaintiffs, OCGA §§ 10-1-372 (a) (8); 10-1-373 (b), and found that the $140,000 in attorney fees were independently warranted under § 10-1-373 (b). The defendants appeal. We affirm in part and reverse in part.

1. The trial court found that all of the plaintiffs-appellees were "public figures" for the purposes of their claim for libel, requiring them to show actual malice on the part of the defendants-appellants before being permitted to recover. On appeal, the defendants contend that the appellees failed to prove actual malice in the preparation of the Skim Milk article. As their initial response to this contention, the appellees contend that (despite the trial court's ruling) they were not public figures for the purposes of this suit, and thus they did not have to show actual malice. In response to this argument, the appellants assert that, inasmuch as the appellees did not file a cross-appeal enumerating the trial court's ruling as error, it is too late to contest that ruling.

The general rule is that an appellee must file a cross-appeal to preserve enumerations of error concerning adverse rulings. OCGA § 5-6-38; *Chester v. Ga. Mut. Ins. Co.*, 165 Ga. App. 783 (1) (302 SE2d 594) (1983) (holding that a cross-appeal was necessary to appeal the trial court's grant of summary judgment to the appellants). However, a ruling that becomes material to an enumeration of error urged by an appellant may be considered by the appellate court without the necessity of a cross-appeal. See *Southeast Ceramics, Inc. v. Klem*, 246 Ga. 294, 295 (1) (271 SE2d 199) (1980); *Haggard v. Bd. of Regents of the University System of Ga.*, 257 Ga. 524 (4 (a)) (361 SE2d 566) (1987). In this case, a determination of the status of the appellees is critical to the disposition of errors enumerated by appellants. Accordingly, we will review the trial court's ruling that appellees are public figures.

2. After reviewing the record, we conclude that the trial court erred in ruling that appellees were "public figures" for the limited purposes of appellees' claim for libel.

"The definitive test for determining whether an individual is a public figure was established in *Gertz v. Robert Welch, Inc.*, 418 U. S.

323 (94 SC 2997, 41 LE2d 789). . . . 'That designation (public figure) may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular *public* controversy and thereby becomes a public figure for a limited range of issues.' [Emphasis supplied.] *Gertz*, supra at 351." *Sewell v. Eubanks*, 181 Ga. App. 545 (1) (352 SE2d 802) (1987).

Here, the appellants do not contend that appellees are public figures for all purposes, and the evidence does not support their assertion that they are "limited purpose public figures." As to the latter issue, the controversy in which appellees have become involved is primarily a private struggle within the confines of the medical profession. Moreover, the controversy is chiefly of interest to plastic surgeons and other physicians who perform plastic surgery, and would appear to have significantly less interest for other medical specialties. Furthermore, the controversy has been manifested, for the most part, in the pages of medical journals and other publications whose circulation is generally confined to doctors. We therefore hold that the dispute in question has a substantially private nature, and therefore appellees are not limited purpose public figures. See *Sewell v. Eubanks*, supra, 181 Ga. App.; *Western Broadcasting of Augusta, Inc. v. Wright*, 182 Ga. App. 359 (356 SE2d 53) (1987).

3. Having determined that the appellees were private figures, we must now determine whether the evidence was sufficient to support the verdict for libel.

The disputed article had its genesis in a long-simmering controversy between two groups of doctors. One group, typified by appellants Drs. Huger and Rusca, are plastic surgeons. Their national professional association is the American Society of Plastic and Reconstructive Surgeons (ASPRS). Their local association, the Georgia Society of Plastic Surgeons, Inc. (GSPS), is the third appellant in this case. The opposing group of doctors, which includes appellee Dr. Anderson, is composed of otolaryngologists who perform plastic surgery on the head and neck. (Dr. Anderson was a prominent pioneer among this group of otolaryngologists.) A professional association of members of this class, the American Academy of Facial Plastic and Reconstruction Surgery (AAFPRS), is an appellee. The remaining appellee, the American Association of Cosmetic Surgeons (AACS), is an association of physicians from different specialties who use AACS as a forum to exchange their views on cosmetic surgery. The evidence at trial showed that plastic surgeons have been concerned for many years about the growing number of otolaryngologists who are performing plastic surgery, and have sought ways to combat such competition.

The catalyst for the Skim Milk article was two earlier articles, both entitled "An Old Medical Specialty Puts on a New Face . . . and Head . . . and Neck." The first article, authored by Dr. Anderson, was published in the August 1980 Journal of the Southern Medical Association. The second article, authored by Dr. Anderson and another otolaryngologist, was printed in the October 1981 edition of the MAG Journal. The articles announced that otolaryngologists were changing the names of their organizations to reflect the broadening of their specialty to include head and neck medicine and surgery.

Subsequently, GSPS decided to publish in the MAG Journal a response to the article by Dr. Anderson. Dr. Rusca, the president of GSPS, formed a committee to write the response, with Dr. Huger as a member. The committee asked each member to submit an article, with the committee to select the article for publication from these drafts. The draft which was selected, Dr. Huger's, was published as the Skim Milk article after being approved and endorsed by Dr. Rusca. In drafting this article, Dr. Huger borrowed liberally (in many instances, word-for-word) from three earlier documents, one by Dr. Boyd Burkhardt, an Arizona plastic surgeon, and another by Dr. Sherrell Aston, a New York plastic surgeon. Dr. Burkhardt's writing had been published as a one-page article in the April 1975 issue of the "Sombrero," the journal of the Pima County (Arizona) Medical Society. This article became the basis for much of Part I of the Skim Milk article. The document authored by Dr. Aston, "Specialty Board Certification," was a historical perspective of plastic surgery which he and a ghost-writer had prepared for ASPRS. The third document used by Dr. Huger was a position paper, "Plastic Surgery and Its Practitioners," which ASPRS had prepared as a statement of its view of performance of plastic surgery by otolaryngologists. The Aston paper and the ASPRS position paper were the foundation for some of Part II of the Skim Milk article. In addition to these sources, Dr. Huger made lesser use of certain other documents, his use of which is not in issue.

Neither Dr. Huger nor the other appellants performed any independent research or investigation of the facts which the Skim Milk article asserted. Instead, to the extent the Skim Milk article drew on the Burkhardt, Aston, and ASPRS papers for its text, the appellants relied on the veracity and accuracy of the source documents. Dr. Huger testified that he had met Dr. Burkhardt, and that he knew his reputation, which was good, and had no reason to question his qualifications. As to Dr. Aston, Dr. Huger testified that he personally knew him, that he had an excellent reputation, and that he had no reason to question the accuracy of Dr. Aston's research.

Dr. Huger admitted that he knew at the time the Skim Milk article was published that Dr. Anderson had an excellent reputation with respect to his performance of plastic surgery, and that he had had no

facts to suggest that his qualifications to perform facial plastic surgery were "shaky" or that he had founded any societies as a smokescreen to hide deficiencies in his qualifications. Dr. Huger, however, maintained that the portions of the article referring to shaky qualifications and smokescreens were not referring to or related to Dr. Anderson.

Dr. Rusca testified that at the time the Skim Milk article was published he did not know exactly what Dr. Anderson's training or particular qualifications were, but he had heard rumors about "problems" he had had with plastic surgeons, and on that basis thought his qualifications to be a plastic surgeon were not "appropriate." However, he also admitted that he had had no reason to question his qualifications for performing facial plastic surgery, and in fact knew that he was well respected for his work. At the time of the Skim Milk article, the appellants were aware that ASPRS was under investigation by the Federal Trade Commission for a campaign to disparage otolaryngologists.

Considering the foregoing evidence, we conclude that the evidence was sufficient to support the verdict. See OCGA §§ 51-5-1 and 51-5-5.

4. Appellants contend that the award of damages for common-law unfair trade practices was erroneous for a number of reasons. One of their contentions is that in Georgia there is no cause of action for damages resulting from disparagement of goods and services (i.e., trade libel). Cf. *Diedrich v. Miller & Meier &c.*, 254 Ga. 734 (2) (334 SE2d 308) (1985) (holding that damages will lie in a common-law suit for trade name infringement). We pretermit consideration of this and all but one of the other contentions which they raise, because we find that, assuming that damages will lie for trade libel, appellants are correct in arguing that in this case such damages constitute an impermissible double recovery.

"Although the torts of defamation and injurious falsehood protect different interests, they may overlap in some fact situations. This happens particularly in cases of disparagement of the plaintiff's business or product. If the statement reflects merely upon the quality of what the plaintiff has to sell or solely on the character of his business, then it is injurious falsehood alone. Although it might be possible to imply some accusation of personal incompetence or inefficiency in nearly every imputation directed against a business or a product, the courts have insisted that something more direct than this is required for defamation. On the other hand, if the imputation fairly implied is that the plaintiff is dishonest or lacking in integrity or that he is perpetrating a fraud upon the public by selling something that he knows to be defective, the personal defamation may be found. In this case it is common to sue in defamation because the damages are more com-

prehensive. Action may be brought in the same suit for both torts, however, *so long as the damages are not duplicated.*" Restatement of Torts 2d, § 623A at 341. (Emphasis supplied.)

In the present case the essence of the appellees' claim for unfair trade practices was that they had been accused of having inferior qualifications as practitioners of plastic surgery and that they were attempting to create a "smokescreen" to disguise their lack of qualifications. Their claim therefore substantially overlapped their claim for personal defamation, and the judgment for damages for unfair trade practices must be reversed.

5. Appellants contend that the imposition of an injunction was improper. We agree.

In past cases this court has consistently "exhibited its firm policy to protect the right of free speech. . . ." *High Country Fashions, v. Marlenna Fashions,* 257 Ga. 267, 268 (357 SE2d 576) (1987). The general rule is that equity will not enjoin libel and slander, but we have sustained a permanent injunction against libel where, among other things, the order was "based on a continuing course of repetitive conduct, [so that] the court [was not] asked to speculate as to the effect of publication." *Retail Credit v. Russell,* 234 Ga. 765, 778 (V) (218 SE2d 54) (1975).

In the present case the injunctive order is not based on a continuing course of repetitive conduct by these defendants. Instead, only a single act of disparagement — the publication of the Skim Milk article — is attributable to them. We therefore reverse the portion of the judgment granting a permanent injunction, on the ground it constitutes an impermissible prior restraint.

6. Another part of the judgment for our consideration is the trial court's award of attorney fees. We find that the award was not authorized on any of the three bases found by the jury and the trial court. We therefore reverse the award of attorney fees.

7. The appellants argue that the verdict is excessive as a matter of law. We disagree. Considering all the circumstances of this case, we cannot conclude that the verdict is excessive as a matter of law.

8. Appellants contend that the Skim Milk Article constituted the opinions of the authors with respect to the training and qualification of certain other physicians to perform plastic surgery, and that those statements were not libelous. However, we find this assertion has no merit. After carefully reviewing the disputed article, we conclude the article contains at least some expressions of fact. See Restatement of Torts, 2d (1979), §§ 565, 566, comment b.

9. The appellants' remaining enumerations of error are either mooted by our holdings in the previous divisions of this opinion, or are without merit.

*Judgment affirmed in part and reversed in part. All the Justices*

*concur, except, Hunt, J., who concurs in the judgment only.*

## On Motion for Reconsideration.

The appellants contend that they have suffered an "enormous injustice," based on our holding that the plaintiffs-appellees are private figures. They point out that the superior court's ruling that the plaintiffs-appellees are public figures was made before the arguments of counsel and the charge to the jury, and argue, specifically, that certain defenses applicable to private figures, which were contained in their requests to charge Nos. 18 through 23, were not given as instructions to the jury. However, we find there was no prejudice to appellants. The requests to charge in question address the defense of privileged communications. Our review of the instructions which the court gave shows that the court's instructions, taken as a whole, fairly covered the subject matter of the appellants' requests to charge. We therefore find no merit to appellants' contention.

DECIDED DECEMBER 4, 1987 —
RECONSIDERATION DENIED DECEMBER 17, 1987.

*Long, Weinberg, Ansley & Wheeler, Sidney F. Wheeler, J. M. Hudgins IV, Stephen H. Sparwath,* for appellants.
*Smith, Gambrell & Russell, Harold L. Russell, Thomas W. Rhodes,* for appellees.

*The Georgia Society of Plastic Surgeons, Inc., stresses the importance of adequate training as a qualification for performing cosmetic surgery.*

# "Things Are Never What They Seem, Skim Milk Masquerades as Cream"*

JOHN A. RUSCA, M.D., and WILLIAM E. HUGER, JR., M.D., *Atlanta***

*In the October, 1981, issue of the* Journal, *a paper was published concerning a new Head and Neck Medicine and Surgery specialty. The* Journal *has a responsibility to serve as a forum for the expression of differing viewpoints within the Association. The following article is therefore submitted as a position statement by the Georgia Society of Plastic Surgeons, Inc.*

## Part I

GEORGIA PLASTIC SURGEONS were amused to see in the October, 1981, issue of the *Journal of the Medical Association of Georgia* Dr. Jack Anderson's partyline article about the otolaryngology fraternity having added Head and Neck Medicine and Surgery to its name. This name change is especially interesting. Dr. Anderson seemed to be a prime mover in forming the American Academy of Facial Plastic Surgery, to claim an aptitude for doing cosmetic surgery. Also, seemingly under his tutelage, but with a plastic surgeon as its President-Elect to give it respectability, the American Association of Cosmetic Surgeons has been formed. This latter organization has graciously volunteered to act as a peer review group for cosmetic surgery. Both organizations, which appear to be splinter groups of the otolaryngology fraternity, are relatively unknown and appear blissfully devoid of any particular formal qualifications. Is there now a Head and Neck Medicine and Surgery Section of the Council and

Academy of Otolaryngology or can just anyone in the fraternity do cosmetic surgery? After all, under Georgia law, a fresh graduate of an accredited medical school after 1 year of internship may begin practice as a neurosurgeon, ophthalmologist, or whatever. Why not a cosmetic surgeon? In our own legislative stupidity, however, let us not misinterpret the meaning of a name change, which carries with it no more credential than just that alone.

In recent years, the specialty of plastic surgery, which has traditionally included a wide range of cosmetic procedures, has become very attractive to various practitioners who wish to generate a lucrative cosmetic practice, but perhaps understandably do not wish to encumber themselves with the years of postgraduate surgical training required for plastic surgery certification. Although not feeling that training is necessarily the mother of competence, these practitioners obviously would agree that necessity is the mother of invention. If one's qualifications are shaky, the best conceivable smoke screen is to create a new organization with a high-sounding name, join it, issue yourself a certificate for display in your waiting room, and circulate the good news to all the medical societies in the country via a mass mailing! Admittedly, announcing that your organization is now set up for peer review is a stroke of presumptuous genius, which must be admired by even the most aggressive cosmetic-surgeon-without-portfolio.

This name game is becoming an old one, but the faces of the players are strangely familiar. This publicity emanates from a group of otolaryngologists who seem to be unhappy with their image and are trying desperately to do something about it. A new Academy, a new Association, and now a new name

* From Gilbert and Sullivan's "Mikado."
** Dr. Rusca is Immediate Past President, and Dr. Huger is Past President, of the Georgia Society of Plastic Surgeons. Dr. Rusca's address is 5675 Peachtree—Dunwoody Rd., NE, Ste. 506-C, Atlanta, GA 30342. Dr. Huger's address is 35 Collier Rd., Ste. 675, Atlanta, GA 30309.

change! My, my, the potential for future word combinations is positively underwhelming!

Georgia plastic surgeons who have gone the route of long years of required training have no quarrel with men in other specialties who wish to do cosmetic surgery, provided they are adequately trained in these procedures before applying for the necessary hospital privileges. We do feel strongly, however, that they should at least identify themselves properly, as do other members of the various surgical subspecialties.

The current president of the American Association of Cosmetic Surgeons is Walter E. Berman, M.D. The 1981 Directory of Medical Specialists lists him as an otolaryngologist, practicing in Beverly Hills, without listing any formal training for him in plastic and reconstructive surgery. The President-Elect is Dr. Richard A. Grossman, who is indeed a plastic surgeon, practicing in Sherman Oaks, California. The organization must be desperate for respectability so that necessity demands his selection. Nevertheless, one pint of whipping cream cannot significantly enrich thousands of gallons of skim milk.

## Part II

In 1917, ophthalmologists, attempting to upgrade their profession, founded the American Board of Ophthalmology as a certifying agency only. It was without legal power, but it established acceptable levels of background training and competence in order to regulate its specialty and protect the public. Recognizing the importance of a certifying agency, the otorhinolaryngologists, to their credit, followed suit in 1924. This trend toward measured competence continued until the last of 23 boards, the American Board of Emergency Medicine, was established in 1979. Recognizing the trend early, the American Board of Medical Specialties was established in 1933, and along with the AMA Council of Medical Education, has carefully guided the incorporation and approval of specialty boards to establish and maintain excellence and competence in each specialty.

The American College of Surgeons, originally set up as an examining board, was primarily interested in basic standards, so that not until 1937 was the American Board of Surgery re-established to evaluate background training and competence in general surgery. Prior to that time, plastic surgery, which developed from the reconstruction of World War I veteran injuries beginning in 1917, was an integral part of general surgery, with a strong core curriculum in general surgery. At that time, with the establishment of the American Board of Surgery for general surgery, the American Board of Plastic

Surgery was born as a subsidiary of the American Board of Surgery and was so recognized in May, 1938. It was granted major specialty status in May, 1941. Throughout its development, the American Board of Plastic Surgery recognized that, although the specialty developed from every other specialty, a *strong core curriculum in general surgery and a close bond with the American Board of Surgery were essential to ensure superior competence in the management of plastic surgery patients.* That recognition was foremost in the minds of those who established the American Society of Plastic and Reconstructive Surgeons in 1931, as well as in those who established the American Society of Aesthetic Plastic Surgery in 1968. That recognition has not changed. *Some other specialty boards have not adhered to that course of planned excellence in training.*

---

*The American Board of Medical Specialists has not recognized the American Board of Cosmetic Surgery as a valid specialty board signifying adequate additional training.*

---

The bona fide plastic surgeon must have 3 years of training in general surgery as his core curriculum, and a minimum of 2 years of training in an approved plastic surgery residency, per se, to include reconstruction of both congenital and acquired defects aimed at improvement in both functional and aesthetic elements. With this background, excellence in the aesthetic element is built into his training, and *the necessity for its inclusion over a minimum 2-year* period has been proven without question in the opinion of parent certifying agencies.

Among those specialties not required by its board to have a strong core curriculum in general surgery has been otolaryngology, in spite of the early foresight of its ancestors in becoming the second specialty to form an agency to establish standards of competence. Somewhere along the way, care of the whole patient was seemingly diverted toward care of only the patient's ears, nose, and throat. No internship was required. Only 1 year of surgical residency and 3 years of otolaryngology training became required. Then came antibiotics and many diseases of the specialty were successfully treated without surgery. What should they do? Aesthetic surgery of the head and neck seemed the obvious field to invade.

Several years ago, a small group of otolaryngologists, seemingly wanting to improve their image, formed the American Academy of Facial Plastic and Reconstructive Surgery claiming excellence in all cosmetic facial procedures. Requirements for membership did not, and still does not, include adequate additional training in cosmetic procedures not en-

joyed by other otolaryngologists. In the past year, that group has distributed to hospital administrations in this country a brochure entitled, "Delineation of Hospital Privileges for the Practice of Head and Neck Plastic Surgery." In it, statements from the American Medical Association, the American Board of Medical Specialists, the American College of Surgeons, the Joint Commission for Accreditation of Hospitals, and the American Society of Internal Medicine are printed out of context to support their claim that the system of certification by specialty boards is meaningless and is invalid to establish competency. As a result, the American Society of Plastic and Reconstructive Surgeons has been forced to distribute its answer entitled, "Plastic Surgery and Its Practitioners," which points out the necessity of establishing a measure of competence in order to protect the public from horrendous surgical errors based on incompetence by virtue of professed adequate training not actually experienced.

*The American College of Surgeons has not recognized the otolaryngology name change to "Head and Neck Medicine and Surgery" as signifying adequate additional training.*

But the effect of this ill conceived threat by a small group of men has been felt. The otolaryngologists have been pressured into adding a fifth year of training. It is an elective year sandwiched in just before the senior resident year and not required as a year of head and neck or cosmetic surgical training. Also, the otolaryngologists have been forced to express a name change to include head and neck medicine and surgery. The same small group set up the American Board of Cosmetic Surgeons. But has anything really changed? The answer is an emphatic no! The American College of Surgeons has not recognized the name change as signifying adequate additional training. The American Board of Medical Specialists has not recognized the American Board of Cosmetic Surgery as a valid specialty board signifying adequate additional training. Instead "mini-training" is being used by the otolaryngologists. As recent as October, 1981, Dr. Jack Anderson, under the sponsorship of the "American Foundation for the Medicine and Surgery of Appearance" scheduled a 5-day seminar, the written objective of which was "to provide the surgeon who has a special interest in cosmetic facial surgery, regardless of his basic background, with practical information about the area of practice and to demonstrate proven methods currently being used." Further stated was that "attendance makes one eligible for later partic-

ipation in the mini-residency program of the American Foundation for the Medicine and Surgery of Appearance." Is this how competent plastic surgeons are trained — by short seminars and mini-residencies?

*We must not let a maverick group, representing a quasi-national organization, interfere with local responsibility, that of dictating the credentials for hospital privileges.*

The position of the bona fide plastic surgeons of Georgia is very clear and concise. They have no desire to prevent properly trained surgeons, otolaryngologists or otherwise, from practicing their specialty, including plastic and reconstructive surgery. What is being asked is that they subject themselves to the same training, credentialing, and peer review as do all other plastic surgeons. The American College of Surgeons and the American Board of Medical Specialists ask no more than that either.

The American Board of Plastic Surgery is currently "bending over backwards" to cooperate in a trial program. The background training of diplomates of the American Board of Otolaryngology is currently considered adequate for them to enter 2-year accredited plastic surgery training programs leading to American Board of Plastic Surgery examination. The Plastic Surgeons of Georgia welcome among us such graduates credentialed by the American College of Surgeons and the American Board of Medical Specialists through the medium of the American Board of Plastic Surgery. There are many, many very fine, well trained, properly motivated, and highly respected otolaryngologists who provide excellent patient care. We must not let a maverick group, representing a quasi-national organization, interfere with local responsibility, that of dictating the credentials for hospital privileges. We should heed the American College of Surgeons, the American Board of Medical Specialists, and particularly the Joint Commission of Accreditation of Hospitals whose Accreditation Manual clearly states that "eligibility as defined by the appropriate board, is an excellent benchmark to use as a basis for privileged delineation" in protecting the public interest.

We hope that all of the physicians and people of Georgia will not be mislead by a name change and will join us in urging our otolaryngology colleagues who have an interest in cosmetic surgery to acquire the established minimum 2-years' training in an accredited plastic surgery residency before presenting themselves to their colleagues and the public as competent cosmetic surgeons.